## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| COREY D. CLARK | ) | **CIV. NO.** _____ |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| E! ENTERTAINMENT | ) | |
| TELEVISION, INC., | ) | **JURY DEMAND** |
| E! ENTERTAINMENT TELEVISION | ) | |
| INTERNATIONAL HOLDINGS, LLC | ) | |
| FOX INC. | ) | **ECF** |
| GIBSON DUNN & CRUTCHER | ) | |
| MORRISON FOERESTER | ) | |
| Defendant. | ) | |
| | ) | |

## COMPLAINT

    **COMES NOW** the Plaintiff COREY DELANEY CLARK ("Plaintiff"), a United States citizen domiciled in the State of Tennessee and residing within this District, by and through his counsel, JH FREEMAN LAW, to state his causes of action at law and in equity as against Defendants E! ENTERTAINMENT TELEVISION, INC. and ("Defendants").

    As per the annexed Verification, Plaintiff swears, under the penalty of perjury, that the following statements are true and correct to the best of Plaintiff's personal knowledge and experience:

## JURISDICTION AND VENUE

1.     This Court has personal jurisdiction over the Defendant by reason of the fact that Defendant transacts business in the State of Tennessee.

2.     Defendants have committed tortious acts in the State of Tennessee having an injurious effect to the property rights conferred to Plaintiff pursuant to the Tennessee State Constitution.

3.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the Plaintiff and Defendant, and the amount in controversy exceeds the sum of seventy-five thousand ($75,000.00), exclusive of interest and costs.

4.     This Court has supplemental jurisdiction over the claims for relief that arise under Tennessee statutory and/or common law pursuant to 28 U.S.C. § 1376(a) because they form part of the same controversy and derives from the same facts.

5.     Venue is proper pursuant to 28 U.S.C. §§ 1391 and 1400(a).

6.     Venue is also proper because in a defamation action, a plaintiff may sue in any jurisdiction where the defamatory remarks are published. *Keeton v. Hustler Magazine, Inc.* 465 U.S. 770 (1984). Here, the statements were published on a cable television channel owned and operated by Defendant and the libelous communications were received within this District.

2                                    **COMPLAINT**

## PARTIES

### Plaintiff

7.      Plaintiff COREY DELANEY CLARK ("Plaintiff or "Corey Clark") is an individual citizen of the State of Tennessee and is domiciled within this Judicial District. From November 4, 2002 through March 31, 2003, Corey Clark was featured as a principal singing performer on the second season of the television program *American Idol*. Plaintiff is currently a self-employed singer/songwriter, a husband and father of three children.

### Defendants

8.      Defendants E! ENTERTAINMENT TELEVISION, INC. and E! ENTERTAINMENT TELEVISION INTERNATIONAL HOLDINGS, LLC, FOX Inc., Gibson Dunn, Morisson Foster ("E! CHANNEL" or "Defendants") is a publicly-traded corporation organized under the laws of the State of Delaware, that is authorized and/or registered to do business in the State of New York. Defendant's principal place of business is located at 5750 Wilshire Blvd., Los Angeles, CA 90036. Defendant owns and operates the cable television network E! CHANNEL! and the website www.eentertainment.com. Defendant actively solicits viewers and internet traffic in the State of Tennessee and purposefully avails itself of the laws of the State of Tennessee.

9.      Defendant operates a basic cable television network reaching approximately 97 million U.S. homes with a mix of celebrity gossip, entertainment news, and reality-based programming.

10.     Defendant's schedule includes such shows as *The Soup*, *Chelsea Lately* and the E! *True Hollywood Story* series.

11.     Defendant operates a corresponding website *E! Online*, which reaches more than 6 million unique U.S. users per month and has more than 20,000 entertainment news stories archived.

12.     E! CHANNEL is part of the portfolio of cable television networks owned by

3

COMPLAINT

NBC/Universal.

## AMERICAN IDOL
## BACKGROUND

13.    *American Idol* (originally titled *American Idol: The Search for a Superstar*) is a worldwide television series, singing talent show, music industry contest, global brand name and multi-billion dollar merchandising franchise, among other things.

14.    The concept for *American Idol* is purportedly based on a U.K. program entitled *Pop Idol,* a televised talent "contest" for musical artists, namely singers, that allows the viewing audience to participate in and ultimately select the winning performer via text messaging and telephone voting. The audience participation generates a pre-established market for the winning artists and other finalists.

15.    The television show *American Idol* (the "Production") premiered on Fox Broadcasting Network ("FOX") on June 11, 2002 and it has since become the highest-rated and most popular television program in U.S. history.

16.    The Production completed its eleventh season in May 2012 and the twelfth season began airing on January 16, 2013.

17.    Upon information and belief, the Production, intellectual property rights and brandname franchise *American Idol* is owned and produced by FremantleMedia North America, Inc., 19 Entertainment Ltd. (and its related 19 Companies), Core Media Group, Inc. (collectively, "IDOL-RING").

18.    While *American Idol* has been characterized by the media as a Reality TV show, it is marketed, packaged, advertised and labeled by IDOL-RING as a "contest" whose winner is determined by the televised viewing audience after a select number of Semi-Finalists (anywhere from 24 to 45) have been pre-qualified by IDOL-RING.

4

COMPLAINT

19.     Plaintiff Corey Clark was cast in 2002 by IDOL-RING – altogether unwittingly – as a principal performer to occupy a fictional role, namely, *American Idol's* premier villain in a scripted television show.

20.     The writers and producers behind IDOL-RING knew exactly when Corey Clark would be publically disqualified from the "contest" as well as when Plaintiff would be resurrected to be exploited again as the lover of (former) *American Idol* Judge Paula Abdul.

21.     The problem is that unlike professional actors who are retained to play the fictional role of a villain for the duration of a scripted series, and who are able to thereafter resume their ordinary lives as upstanding citizens in the community, Plaintiff here has been typecast by IDOL as the villain for the remainder of his entire *real* life, and presumably for the lives of his natural born heirs as well who shall, in the absence of this Courts' award of relief, read all about the false and defamatory statements made about Plaintiff on the worldwide internet.

## COREY D. CLARK

### Life before *American Idol*

22.     Corey D. Clark, born July 13, 1980, is the eldest son of the marital union between an African-American R&B singer, Duane Clark, and a White/Jewish female vocalist named Jan Clark. Corey was born in San Bernardino, California, where his grandfather had the privilege of serving as the town's first African-American police officer.

23.     Since Corey was a small child, music always played a major role in his life. His parents were both working musicians. At the age of 12 years old, Corey began his music career singing backup for Barry Manilow, who extended him a role on stage.

24.     By the time Corey was 15 years old, he founded his own R&B singing group called *Envy*, recruiting some of the most talented singers in his neighborhood to join the collective.

Case 3:13-cv-00058   Document 1   Filed 01/25/13   Page 5 of 44 PageID #: 105

25. In 1997, when Corey was only 17 years old, the group went on perform at the world famous *Apollo Theater* (Amateur Night) in New York City.

26. In 1998, *Envy* signed an independent record deal in Las Vegas and upon graduation from high school, moved to Los Angeles to pursue professional careers in the music industry.

27. From 1998-2000, *Envy* played the opening act for such notable groups as *Destiny's Child*, *Mya* and *KRS-One*. They also appeared on MTV. However, after two years of struggling to land a major label record deal as a group, the four members of *Envy* decided to go their separate ways and pursue individual careers as solo artists.

28. One of *Envy*'s early group members, who Corey had known since he was only 15 years old, was Shaffer C. Smith. Mr. Smith has gone on to an illustrious career in the music business as chart-topping recording artist / songwriter *Ne-Yo,* a Grammy-award winning international superstar.

29. At about the time that *Ne-Yo* landed his first major label record deal on Columbia Records, Corey Clark, a consummate workaholic focused on his career success as a singer / songwriter, heard about a new concept for a talent show and singing contest.

### Corey Clark's Reasonable Expectations Based on *American Idol's* Marketing and Promotions to Aspiring Singers

30. After auditioning a couple of times for this new model of hybrid talent show / reality contest, and viewing the first season of *American Idol* on television in the summer of 2002, Corey Clark developed a reasonable expectation that such shows could provide a valuable platform to gain visibility and launch his major label solo recording career.

31. At the time the first season was broadcast, Corey Clark reasonably understood that there was a Reality TV element to the show, manifested by the aspect of living together in a house with other real life singing contestants. Other than that specific aspect, Plaintiff did not understand the difference between *American Idol* and any other televised talent shows he had seen on television

COMPLAINT

before, particularly *Star Search.*

32.     Having "behind-the-scene" footage was a cool feature, Plaintiff thought, but the <u>true</u> <u>nature</u> and purpose of *American Idol* was <u>as advertised</u> in commerce and specifically portrayed on television to great fanfare, which is to say: *American Idol* in the summer of 2002 was promoted, depicted, marketed and portrayed <u>in fact</u> and <u>at law</u> as a *bona fide* singing contest with a concrete offer of a valuable prize, namely a major label recording contract.

33.     In the promotions leading up to auditions for the first season in the Spring of 2002, IDOL offered through media publications a "$1 Million Recording Contract" to consumers in the U.S. marketplace.  With respect to the second season, however, which commenced auditions in October 2002, no dollar amount was actually announced.

34.     The break-out commercial success of *American Idol* season one winner Kelly Clarkson had significantly raised the stakes of the prize in Season Two.  Because now, going into Season Two, the U.S. public was led to expect that the dollar value of "the recording contract" offered in the first season was a virtual by-product of a grander material prize: the widespread fame, glory, adoration and respect of the public marketplace at large for having competed successfully on the merits in good-faith pursuit of the goal to be an *American Idol.*  For even those Season One finalists who did not place #1, there was a high level of stardom, of instant recognizability, of *lifestyle* that accompanied the finalists' post-show activities, thereby providing an opportunity for them (perceivably) to capitalize on the increased value of the Artist's state constitutional rights to publicity.

35.     IDOL-RING's offer of a major label recording contract was exactly the prize that Corey Clark sought to achieve when he auditioned for Season Two of *American Idol* in late October 2002. His childhood contemporary and long-standing groupmate *Ne-Yo* had just signed his own major

7

COMPLAINT

label deal several months prior. Corey Clark reasoned that if his old friend Shaffer achieved that goal, then Corey himself was certainly capable of achieving the same.

36.     Having viewed the first season of *American Idol* on television, and considering that Justin Guarini had reached the second spot, Corey Clark was extremely confident in his chances to win the entire contest in Season Two. That sentiment would later be echoed by the master judge Simon Cowell, as well as consummated in more personal terms by *Grammy-award* winning pop star Paula Abdul.

### Corey Clark's Arrest in Topeka, Kansas [October 12, 2002]

37.     Before October 12, 2002, then 22-year-old Corey Clark had never been arrested in his life.

38.     Plaintiff was brought up by his parents to be a law-abiding citizen.

39.     On the night of October 12, 2002, Corey Clark was babysitting his 15-year-old sister in their family home in Topeka, Kansas. He was not living in Kansas at the time, but came back to watch out for his younger sisters at the behest of his parents. They were both working long hours and having trouble coping with a young female teenager who had been sneaking out of the house to meet with her boyfriend.

40.     While babysitting that night, Clark's 15-year-old sister announced that she was leaving to visit a friend. Corey insisted that she could not go, that he was there to make sure that she could not leave the house. The two began to argue and the noise escalated. His sister tried to leave the house and Corey blocked the door. A neighbor came over to see what the fuss was about. Corey told her in no uncertain manner to leave the premises. The neighbor stated that she would call the police.

41.     When the police officers arrived at the family home, they assessed the situation and decided it would be in the 15-year-old's best interest to be taken to juvenile intake. Corey Clark adamantly objected to this idea and insisted that the officers wait for his parents to arrive. When

COMPLAINT

Clark refused to let the officers pass to take his sister into custody, the officers put him under arrest, but not before four cops beat him and kicked him to the ground. One threatened him with a stun gun.

42.     Once apprehended, the police officers wrote detailed narratives about the scene and charged Clark with four misdemeanors, including endangering a child. Notably, the government's accusations that Clark had physically assaulted his younger sister rested on the testimony of only one officer, M. Soden, who claimed to have interviewed Clark's sister at the scene. Officer Soden stated in his report that although he could not understand much of what the young girl was saying, and although he saw no visible bruises, the sister claimed that Corey Clark had "slapped" her in the face.

43.     Corey Clark's sister has at all times maintained that her older brother never hit her. On April 21, 2003, Plaintiff's sister was quoted by PEOPLE magazine as saying: "he [Corey] never hit me". Clark's mother commented that the entire incident was a misunderstanding, a "babysitting gig gone badly."

44.     Moreover, Plaintiff has at all times maintained that his arrest in Topeka, Kansas on October 12, 2002 was unwarranted. In fact, as a matter of public record, the charges against Plaintiff were dropped in their entirety on November 18, 2002. As reflected on the docket, Clark was instructed by the Clerk of Shawnee County Court to pick up his bond check because no charges had been filed with 30 days. He rightfully assumed that the charges had been dropped because the arrest was unwarranted in the first instance.

45.     But two weeks later, on the eve of his arrival to Hollywood after earning the prized Golden Ticket, the government's charges against Plaintiff were mysteriously re-instated and a three-count misdemeanor complaint filed by the Shawnee County Assistant District Attorney on December 4, 2002.

46.     Upon information and belief, IDOL-RING played a role in the prosecutor's decision to

Case 3:13-cv-00058   Document 1   Filed 01/25/13   Page 9 of 44 PageID #: 109

proceed with charges against Plaintiff.

47.    Plaintiff did not learn of the reinstated Kansas charges until on or about Monday, January 6 or Tuesday, January 7, 2003.

48.    Plaintiff's family had moved from Kansas to Tennessee in November 2002 and when the summons was issued by the Shawnee County Court on December 5, 2002, it was sent to an old Topeka address and then returned back to sender.

49.    In June 2003, two out of the three misdemeanor charges brought against Plaintiff, including the volatile charges that he had physically assaulted and restrained his 15-year-old sister, were dismissed by the prosecutor for lack of any evidence.

50.    Upon the advice of his counsel and in order to avoid traveling back to the State of Kansas, Plaintiff pled no contest to one misdemeanor count of "obstruction of justice" based on resisting arrest.

### Corey Clark's *American Idol* Audition in Nashville, Tennessee [October 2002]

51.    Plaintiff Corey Clark was one of 70,000(+) United States citizens between the ages of 18 and 28 who publically auditioned for Season Two of the hit show in the fall of 2002.

52.    From October 30, 2002 through November 4, 2002, Plaintiff auditioned for the Second Season of *American Idol* in Nashville, Tennessee.   Roughly 5,000 contestants auditioned in Nashville that year.

53.    Plaintiff was permitted to audition for the three judges in Nashville only after his merit as a singer had been adjudged and certified by *American Idol*'s senior production team of Nigel Lythgoe and Ken Warwick, as well as junior producers Jonathan Entz and Ron Deshea.

54.    At the time of the audition, the charges from Topeka, Kansas had not yet been dropped and Clark disclosed the existence of the arrest to producer Jonathan Entz, who had acted as Clark's

10

**COMPLAINT**

backstage guide through the four-day audition process. Entz told Plaintiff not to worry about it.

55.     On November 4, 2002, after four days of auditions, Plaintiff became one of thirty-one (31) contestants from Nashville and one of two hundred and thirty-four (234) singers nationwide who was awarded a "Golden Ticket" to Hollywood for Season Two of *American Idol.*

56.     Contestants who are awarded a "Golden Ticket" are provided with all-expenses-paid trips to Los Angeles to compete in the "Hollywood Rounds", where, in the case of Season Two, the contestants were narrowed down from 234 singers to 32 Semi-Finalist contestants.

57.     Plaintiff was awarded a "Golden Ticket" to Hollywood based on a unanimous decision from *American Idol's* distinguished panel of judges: Simon Cowell ("Cowell"), Abdul ("Abdul") and Randy Jackson ("Jackson"). Regarding Plaintiff's audition, Abdul commented that Plaintiff had "star quality"; Cowell stated that Plaintiff had a "good recording voice".

58.     Simon Cowell also wrote about Corey Clark's Nashville audition in his 2003 autobiography, stating: *"We met Corey Clark in Nashville, and Paula [Abdul] fell for him instantly; she thought he could be another Justin Guarini, though he had a twinkle in his eye and it was clear that he was a bit more of a bad boy than Justin."*

59.     Plaintiff's Golden Ticket indicated that he was to receive an information packet in the mail from *American Idol* within 10-14 business days of his November 4, 2002 audition. The Golden Ticket further instructed that Plaintiff should not attempt to contact the offices of the Producers.

60.     After his audition on November 4, 2002, Plaintiff did not hear anything from the Producers and did not receive any package in the mail.

61.     On the afternoon of Thursday, December 5, 2002, just four days before Plaintiff was scheduled to be in California for the start of Hollywood Week, Plaintiff received an urgent call from the production offices of *American Idol* stating that he needed to "hurry up" and fill out the

Case 3:13-cv-00058  Document 1  Filed 01/25/13  Page 11 of 44 PageID #: 111

paperwork and fax it in before the next business day (Friday, December 6) was over. Plaintiff stated that he had never received any information packet in the mail. The production office therefore faxed Plaintiff a 50-page document at approximately 3:23 pm on December 5, 2002.

62.     The December 5, 2002 fax from American Idol Productions, Inc. contained a 16-page long-form Contestant Agreement and Release plus travel and press information. Plaintiff quickly reviewed the Agreement, without the advice of counsel, signed it on December 6, 2002, and brought the signed agreement with him on the plane to California.

63.     Plaintiff arrived in California on Monday, December 9, 2002 for the beginning of Hollywood week. The Contestant Agreement and Release was countersigned by Amanda Chacon of American Idol Productions, Inc. on December 9, 2002.

**Hollywood Week – Season Two [December 9-14, 2002]**

64.     When Corey Clark arrived to Hollywood on December 4, 2002, he waited in line with all the other 234 hopefuls, until a junior producer named Camilla Rahman waved him over to a check-in table. She wanted to ask him questions about the background form contained in the CONTESTANT AGREEMENT AND RELEASE that he had signed on December 6, 2002.

65.     When the issue of Corey Clark's criminal history came up, Plaintiff disclosed to Rahman that he had in fact been arrested in Topeka, Kansas but that there was no need to worry about it because the charges against him had been dropped. Clark produced a copy of the returned bond check as proof. Rahman told Plaintiff not to worry about it. If it was dismissed, then it was dismissed. She wished him luck.

66.     On or about Wednesday, December 11, 2002, Corey Clark sang "Kiss for a Rose" by Seal during his group audition. When it was his time to solo, Plaintiff, left the stage and walked over to the Judge's table to serenade Paula Abdul. He also kissed Paula Abdul's hand, much to the

12

COMPLAINT

delight of Abdul. It was, for many who witnessed it, an unprecedented showing of audacity. But it worked, because Plaintiff received high marks from the Judges, particularly Abdul

67.     After Randy Jackson critiqued Plaintiff for singing off key, Abdul remarked: *"Corey that was good. Very sweet. Who cares? I got you to come up to me, come on. Girls? [turning to audience] would you like that to happen to you? Girls like that, girls love that."*

**Abdul Solicits Plaintiff**

68.     Shortly after Clark's performance on December 11, 2002, *American Idol* Judge Paula Abdul, who was publically magnetized by what she described as Corey Clark's "star quality", initiated communications with Plaintiff via her backstage assistant and promptly offered to be his "special friend".

69.     Within hours of first speaking to Abdul on her home telephone, Abdul sent a private car service to pick Corey Clark up and transport him to her home.

70.     By the end of Hollywood Week, on Saturday, December 14, 2002, Plaintiff learned that he had made the cut as his name was announced as one of the Top 32 contestants. That same day, the Top 32 finalists were brought before CNN to do a press junket.

71.     Abdul thereafter assumed the role of Corey Clark's music industry mentor for several months.

72.     After Abdul and Clark grew to know each other personally, a romantic connection evolved and was ultimately consummated through a sexual relationship.

73.     Abdul and Clark each confessed their love for each other.

**Simon Cowell's Prediction That Corey Clark Was A Strong Contender to Win Season Two of** ***American Idol*** **[December 14, 2002]**

74.     Simon Cowell is one of the most highly respected and successful record industry professionals in the history of the music business. His professional success is largely based on his

13                                                        COMPLAINT

ability to predict the future success of unknown, aspiring singers and to "tell it like it is."

75.     At the time that Plaintiff participated on Season Two of *American Idol,* Cowell had amassed considerable success in Europe as an "A&R" man, and had been credited with selling more than eighty million albums, thirty number one singles, and a hundred Top 30 singles, non-inclusive of the role he played in forming *American Idol* contestants into viable music industry stars with industry longevity and millions of dollars in sales (e.g., Kelly Clarkson, Carrie Underwood, Clay Aiken).

76.     At some point toward the end of Hollywood Week of Season Two, on or about December 14, 2002, Cowell publically declared to the media that Corey Clark was a strong contender to win Season Two of *American Idol.*

77.     Specifically, in April 2004, Cowell caused to be published his autobiography entitled *I Don't Mean To Be Rude, But . . . The Truth About Fame, Fortune and my Life in Music,* in which he wrote: "I did an interview around that time [Hollywood Week] in which I was asked who might win, and I mentioned Frenchie [Davis], Ruben [Studdard], Clay [Aiken] and Corey [Clark]."

78.     At an early stage of the competition, it was reasonably foreseeable to Simon Cowell, the most celebrated of *American Idol* Judges, that Plaintiff Corey Clark had a high probability of winning Season Two of *American Idol.*

79.     Cowell also wrote in his autobiography that Corey Clark "was one of the few guys who would hang out after the show" and that Clark "had a good sense of humor, and I never felt he was putting on an act."

80.     Cowell's predictions regarding the success of Season Two *American Idol* contestants turned out to be entirely accurate with respect to Ruben Studdard and Clay Aiken.

81.     Studdard was the winner of Season Two of *American Idol.* According to Cowell's

**COMPLAINT**

autobiography, had Studdard not participated in the *American Idol* talent contest, he never would have landed a record deal with a Major Label. As a direct and proximate result of Studdard's participation in the *American Idol* contest, Studdard has earned in excess of $40 Million since being crowned the *American Idol* of Season Two.

82.     Aiken was the runner-up winner of season two of *American Idol*. As a direct and proximate result of Aiken's second place victory in the *American Idol* contest, Aiken has earned in excess of $40 Million since being crowned the runner-up of *American Idol*.

83.     The other two contestants who Cowell predicted had a reasonable, likely shot at winning the contest were Frenchie Davis and Plaintiff Corey Clark, each of whom were unilaterally extricated from the contest and gutted of the opportunity to compete on their merit.

84.     At the end of Hollywood Week, Corey Clark had been named as a top semi-finalist and was invited back to compete in the live rounds starting February 5, 2003.

### Corey Clark's Live Semi-Finalists Round [February 25, 2003]

85.     On February 25, 2003, Clark performed the song "Foolish Heart" during a live telecast in which the television audience cast their votes.

86.     After Clark's performance, he received two standing ovations from Randy Jackson and Paula Abdul and extended applause from Abdul and Cowell. All the Judges, and the host, gave Corey Clark positive remarks:

• Randy Jackson: *"Good job, dude. Sensational. Sensational. Great song. In Tune. Thanks, dude."*

• Paula Abdul: *"Whoa. Amazing, Un-believable. Unbelievable Great song, you wanna know why great song? I'm telling you, you just blew me away . ..blew me away.. what a beautiful voice ...unique...refreshing. In tune all the way. Yeah! Brilliant, brilliant, brilliant. I'm really excited, too. You made America feel that. You proved right here, right now – you took this serious. Good for you."*

15                          **COMPLAINT**

- <u>Simon Cowell</u>: *"You've put me in a good mood, now. In fact this whole show put me in a good mood. Which I thought was going to make the competition more exciting and I promise you this. If you get in the Top 10, which I think you will, and Josh gets in the Top 12. Throw in the Kimberlies. If you get in the Top 12, it is a much more exciting show than last year.*

- <u>Ryan Seacrest</u>: *"They [your parents] are very happy for you. Congratulations. Watching you, you make it look so easy. Are you that comfortable, that confident?"*

87.    On February 26, 2003, it was announced live on television during the "Results Show" that Corey Clark was voted through by the public to the Top 12 on the strength of the previous night's performance.

### Execution of the 19 ENTERTAINMENT Contracts [March 8-17, 2003]

88.    On Saturday, March 8, 2003, Nigel Lythgoe, his son Simon Lythgoe and Ken Warwick called the Top 12 *American Idol* finalists together to inform them that they needed to pick a lawyer to advise them on signing the "American Idol contracts." The Producers announced that they were going to start paying each finalist $1,000 a week, that they would would be given a clothing budget, that they would be receiving a fixed amount of money for each tour appearance, and a percentage of royalties from the Season Two CD compilation of Love Songs.

89.    Shortly after making the announcement, production assistants passed out what appeared to be *hundreds* of pages of contracts to the Top 12 finalists for their review. The contestants were informed that they would need to sign all the contracts by no later than Monday, March 10, 2003 or they would be automatically disqualified from the show.

90.    The producers then trotted out two attorneys that the Producers wanted the finalists to select. One of the attorneys was barely six months out of law school. The other attorney was a well-established Los Angeles-based entertainment attorney with an impressive resume. The choice was clear to most of the contestants: they wanted to pick the established attorney.

Case 3:13-cv-00058   Document 1   Filed 01/25/13   Page 16 of 44 PageID #: 116

91.     Plaintiff, who had experience in dealing with contracts from his past music industry dealings, expressed concern over the propriety of choosing an attorney that was offered to them by the Producers. He understood at the time that this was a conflict-of-interest.

92.     Corey Clark broke out from the group as they deliberated and called his confidante, mentor and lover Paula Abdul. Plaintiff asked her what he should do. Abdul recommended that Clark call her personal attorney, Howard Siegel, Esq. of Pryor Cashman in New York, to step in and negotiate on behalf of all of the Top 12 Contestants.

93.     After talking to Attorney Siegel on the cellphone, Corey announced to the other contestants that he had secured an attorney for them and that Mr. Siegel planned to fly out to California the very next day to represent their collective interests in negotiating against the Producers. The other contestants didn't understand how Plaintiff managed to arrange such a thing, but they were impressed and agreed to defer their decision until meeting Attorney Siegel.

94.     On Sunday, March 9, 2003, Attorney Siegel flew into California and met with the Top 12 *American Idol* contestants at the "Idol Mansion" and reviewed five separate 19 ENTERTAINMENT contracts with them: a Recording Agreement, a Management Agreement, a Touring Agreement, a Film Production Agreement, and a Merchandising Agreement.

95.     On March 11, 2003, Clark performed the song "This Old Heart of Mine" during a live telecast of Motown week. After his rendition, celebrity guest judge Lamont Dozier described Corey Clark as a "New and Rising Smokey Robison."

### Addendum #2 to the Contestant Agreement and Release [March 12, 2003]

96.     On Wednesday, March 12, 2003, Plaintiff signed a Membership Application for the American Federation of Television and Radio Artists (AFTRA) and signed AMERICAN IDOL ADDENDUM #2 TO THE CONTESTANT AGREEMENT AND RELEASE. Attorney Siegel was not consulted

Case 3:13-cv-00058   Document 1   Filed 01/25/13   Page 17 of 44 PageID #: 117

with respect to any of these documents.

97.    On Monday, March 17, 2003, Clark signed the 19 ENTERTAINMENT contracts after consultation with Attorney Siegel.

98.    On Tuesday, March 18, 2003, Clark performed the song "Against All Odds" for Movie Soundtrack week. Celebrity guest judge Gladys Knight remarked: "I Love the Sound of Your Voice."

## Corey Clark's Final Performance on American Idol: Top 6 [March 25, 2003]

99.    On Tuesday, March 25, 2003, Corey Clark performed the song "Drift Away" during Country Rock Week. It would mark his last performance as a featured artist on *American Idol*. The Judges remarked as follows:

- Randy Jackson: *"I like it, man, I like it, I thought it was good, man, I like it when you go into your upper register, dawg, it was good, it was good."*

- Paula Abdul: *"Yeah, you were on it, Corey, you're on it when you pick songs that can go into that beautiful upper register. And you know what? It's really refreshing, I've said it before, your voice is really refreshing, especially when you go into your upper register and you know what, you are on it tonight, and you are in good voice tonight ..."*

- Olivia Newton John: *"I thought you sang it really well, I liked it. It suited you, and I liked your new hairdo . . . It was really good."*

- Simon Cowell: *"I thought, actually compared to last week . . . I thought you did really really well tonight. Very very good.*

100.    On Wednesday, March 26, 2003, the Results Show revealed that with nine (9) contestants remaining, Corey Clark was <u>not</u> one of the contestants landing in the bottom 3, which meant that his voting results (if any) placed Corey Clark in the TOP 6 as of his last performance on the show.

101.    Before the day Plaintiff was extricated from the show, Corey Clark's "star quality", stage presence and unique musical talent as an African-American singer, songwriter and performer were, on the most part, unanimously celebrated by *American Idol's* judges, celebrity guest judges and

18

COMPLAINT

producers from the time he first auditioned for Season Two of the show in late October 2002 through the date of his extrication on March 31, 2003.

102.   The national television viewing audience, consisting on average of more than 25 million people, repeatedly voted to advance Corey Clark through the *American Idol* competition as one of the Top 10 Finalists.

103.   Clark entered the contest with the reasonable expectation that he would be given the fair opportunity to compete for the prize. Had he not been disqualified, there is strong probability that he would have won Season Two of *American Idol*.

### *The Smoking Gun's* Report of Clark's Arrest Record and Subsequent Removal from *American Idol* [March 31, 2003]

104.   On Monday, March 31, 2003, Plaintiff Corey Clark was abruptly "disqualified" from the *American Idol* contest in a shocking and controversial manner.

105.   Plaintiff's 2003 disqualification from the contest was orchestrated and exploited for maximum media exposure by IDOL.

106.   On early Monday morning, March 31, 2003, *American Idol* producers woke Clark up and notified him that *The Smoking Gun* had published an article entitled "Another Fallen Idol" concerning Clark's misdemeanor arrest in Topeka, Kansas on October 12, 2002. Clark was led to a computer where he was commanded to read *The Smoking Gun* article, which described in vivid detail police report narratives and witness testimonials. The article aslo attached highly confidential, Court-sealed documents consisting of Plaintiff's criminal and civil court record information from the Shawnee County District Court in Topeka, Kansas. *The Smoking Gun* concluded the article by stating:

> So, were/are "American Idol" producers aware of Clark's criminal predicament?
>
> Well, TSG long ago stopped believing anything that reality TV producers say when it comes to what they did or did not know about a contestant's past. It appears that a combination of Keystone Kops background

checks, participant mendacity, and unblinking network indifference has guaranteed that drunk drivers, bankrupt deadbeats, shoplifters, bondage actresses, and assorted convicted criminals will continue to populate reality TV shows.

For its part, Fox has adopted a blanket policy whereby network executives refuse to comment "on the private lives of show participants." That's not a bad stance when you consider that this year's original 32 "American Idol" semifinalists included a convicted thief [Trenyce], an Internet porn model [Frenchie Davis], and a guy who's been charged in connection with a fight that ended in the death of a Pennsylvania man [Jaered Andrews]. In fact, Fox booted the contestant, Jaered Andrews, a month before he was even arrested for misdemeanor assault.

TSG will venture a guess that Fox knew about Clark's rubber checks, but were unaware that he had been popped for battering his little sister (if true, not exactly "Idol" behavior).

107.    After reading the article, Clark was then told to quickly pack his bags because he needed to go see Nigel Lythgoe and explain what happened. A security guard escorted Clark from the house where he was staying to CBS Studios.

108.    Having been told to pack his bags, Plaintiff surmised that he was going to be ejected from the contest; but when he resisted going to see Lythgoe, the security card insisted that he had better go to CBS studios as his attendance was mandatory

109.    When Clark arrived at the studios, Nigel Lythgoe met him along with the staff psychiatrist named "Chris". Lythgoe explained that the Producers were willing to let Plaintiff stay on the show "depending on how much you help us clean this up." Lythgoe explained that FOX required Plaintiff to do a videotaped interview immediately. When Plaintiff expressed concern that he should be allowed to speak with an attorney, Lythgoe stated that there was no time for that and if Corey had any chance of staying on the show, he would need to appear in the videotape.

110.    Under duress, Plaintiff agreed to be videotaped, thinking that his only chance to stay on the show was to be cooperative. Once the tape started rolling, Lythgoe asked Plaintiff to apologize to anyone he had "displaced" from getting into the final 12. Lythgoe also wanted Plaintiff to confess to being a "liar" for not telling senior producers about the arrest. Plaintiff refused to abide by Lythgoe's suggestion of being called a liar and Lythgoe instead suggested that Clark state he was "guilty" of not telling producers about the arrest. Clark asked again whether making such a

COMPLAINT

statement would ensure that he could stay on the show, and Lythgoe guaranteed that it would.

111.    Once the videotape interview was over, Lythgoe left the room. Within 30 minutes, he came back and announced that senior FOX executives demanded that Plaintiff be removed from the show.

112.    Corey Clark was ushered into a van which drove him to his grandfather's house in Rialto.

113.    Nine hours after *The Smoking Gun* reported on Plaintiff's arrest, *The Smoking Gun* then became the first and only publication that Monday, March 31, 2003, to announce that Corey Clark had been "booted" from the show. On the face of *The Smoking Gun* articles, it was quite clear that *The Smoking Gun* author had a direct line into FOX.

114.    Plaintiff's disqualification was purportedly based on claims that Plaintiff had "failed to disclose" or "withheld information" from *American Idol* producers concerning his October 12, 2002 arrest in Topeka, Kansas (the "2002 Kansas Arrest").

115.    That evening, on March 31, 2003, *The Smoking Gun* became the first media outlet to report that Clark had been disqualified by IDOL-RING, reporting that "Nine hours after TSG reported on the pending criminal charges faced by *American Idol* finalist Corey Clark, the 22-year-old singer was removed from the hit program by Fox television and the show's producer."

116.    At the time of Plaintiff's 2003 disqualification, the government's misdemeanor charges against Plaintiff were *pending* trial and therefore had yet to be adjudicated.

117.    The corporate decision to disqualify Corey Clark from the *American Idol* contest (for reasons other than his celebrated talent as a singer or performer) was unilaterally made by *American Idol*'s producers, creators and broadcast network executives; and, upon information and belief, with the participation of *American Idol*'s corporate sponsors, contractual beneficiaries and/or third party contractual beneficiaries.

**COMPLAINT**

**FOX's Public Statements Regarding Corey Clark's "Disqualification" [March 31, 2003]**

118.   Since the date of Corey Clark's extrication from *American Idol* on March 31, 2003, FOX and *American Idol* Producers have published or caused to be published at least two, separate written statements to the news media concerning the alleged justification for removing Plaintiff Corey Clark from Season Two of the *American Idol* contest.

119.   The March 31, 2003 Press Release, issued by FOX to *The Smoking Gun*, states as follows:

> "Due to events that have recently come to light, *American Idol* participant Corey Clark has been removed from the contest.
>
> All participants are required to provide full and accurate information to assist in background checks, including disclosure of any prior arrests. Corey withheld information about a prior arrest which, had it been known, might have affected his participation in the show. Due to his failure to disclose, compounded by an error in a police report which misspelled Corey's name, the incident was not discovered during the background check. The producers and network feel that Corey's behavior warrants his disqualification.
>
> Unfortunately, the search process is not perfect. We regret the error, but the only thing we can do is learn from the incident, continue to improve the background check process, and move on.
>
> At this time, no decision has been made as to how this will impact this week's shows."

120.   In the weeks following Plaintiff's 2003 disqualification, Plaintiff issued public statements to the national media, including PEOPLE magazine, in which he vehemently protested his unjust disqualification from *American Idol*.

121.   Plaintiff particularly challenged the reasons cited by FOX and *American Idol*'s senior executive producer Nigel Lythgoe as the basis for his disqualification.   Corey Clark surmised that the producers of *American Idol* knew about the 2002 Kansas Arrest well before the date of his "disqualification."

122.   Plaintiff also explained that the videotaped interview had been manipulated and edited in

22                                    COMPLAINT

a misleading manner and that Plaintiff was induced to make certain statements in reliance on Lythgoe's representation that he could stay on the show.

123. <u>May 16, 2005 *American Idol* Press Release</u>: On May 16, 2005, in response to public reports that Plaintiff Clark had engaged in a sexual relationship with *American Idol* judge Paula Abdul during the production of Season Two, the producers for *American Idol* publically reiterated the reason for why Plaintiff was disqualified from the contest. In an article published in PEOPLE MAGAZINE, May 16, 2005, Vol. 63, No. 19, entitled "Idol Under Attack", authors Michelle Tauber and Jill Smolowe reported that: "*Idol* producers issued this statement to PEOPLE: 'Corey Clark was removed from the show for failing to disclose his criminal arrest history....'"

**IDOL-RING's Published Rules on Disqualification**

124. The CONTESTANT AGREEMENT AND RELEASE signed by *American Idol* contestants as a pre-requisite to their further participation on *American Idol* provide that the *American Idol* producers and/or FOX may disqualify any contestant at any time for any reason at their sole and absolute discretion.

125. FREMANTLE and 19 ENTERTAINMENT are the co-owners of the copyright to the underlying text contained in a book entitled AMERICAN IDOL: THE OFFICIAL BOOK. The book was published in August 2002 by Bantam Books, a division of Random House, Inc. The book sets forth the requirements for competing on *American Idol*. Regarding disqualification, the book states: "Disqualifications: We reserve the right to disqualify or exclude, in our sole and absolute discretion, any individual from any of the auditions for any reason."

126. Plaintiff avers that up until March of 2012, Plaintiff believed that IDOL-RIG had unfettered discretion to remove him from the show "at will" based on the contractual language. But this was before Corey Clark discovered – in spite of the active concealment by IDOL-RIG – that he

COMPLAINT

was actually an *employee* of American Idol Productions, Inc., and not merely a volunteer.

## Post-Disqualification: Abdul Severs the Relationship with Corey Clark [April 2003]

127.    Shortly after Corey Clark was removed from *American Idol* on March 31, 2003, Abdul ceased communications with him

128.    For almost two years following his 2003 removal from the Production, Plaintiff remained quiet about his love affair with Abdul.

129.    While attempting to obtain a Major Label record deal in Los Angeles, Clark increasingly found himself being "blacklisted" by music industry professionals. He ultimately learned that representatives of the *American Idol* franchise were actively interfering with his efforts to secure contracts.

130.    Despite the formidable obstacles to securing a major label record deal, Plaintiff eventually succeeded on the strength of his musical talent and natural charisma.

131.    Paul Ring of Bungalo Records, which is distributed by major Universal Music, signed Corey Clark to an exclusive recording contract and work promptly thereafter began on assembling a team of professionals to produce Plaintiff's debut album.

132.    Still frustrated by the unwarranted interference from *American Idol* producers, and shunned by his former love interest Abdul, who had promised him substantial moral and financial support in his musical career, Plaintiff resolved in or about December 2004 to "hold nothing back" and ultimately decided that it would serve his best interest to speak about his experience on *American Idol*.

133.    Clark was further compelled to disclose his relationship by the notion that his "disqualification" on the basis of his arrest record was mere pretext for his affair with Abdul: he

Case 3:13-cv-00058   Document 1   Filed 01/25/13   Page 24 of 44 PageID #: 124

thought at the time [2005] that the reason for his removal was the discovery by senior producers, namely Lythgoe and Warwick, of his secret affair with Abdul.

134.    Indeed, in 2009, Plaintiff Clark continued to cite his sexual relationship with Paula Abdul as the primary reason for his removal from the Production.

135.    During the first quarter of 2005, Clark's record label and management retained a book writer to transcribe Clark's memoirs.

136.    However, the book was never actually completed because Plaintiff was fully occupied with recording his debut album.

### Paula Abdul Sex Scandal [April 27, 2005-August 2005]

137.    In late April 2005, gossip magazine *The Globe* and daily newspaper the *NY Post*, each owned by NEWS CORP., reported that Plaintiff had been circulating a "book proposal" about his 2003 love affair with Paula Abdul to various book publishers.

138.    Plaintiff was not responsible for circulating any book proposal and does not recall ever providing authorization to his record label for circulation of such a proposal.

139.    On April 27, 2005, the in-house counsel for American Idol Productions, Inc., Michael Allan Jaffa, Esq., wrote Plaintiff Clark and threatened to sue Clark for $5 Million for purported breach of the "Confidentiality / Disclosure provision" of the *American Idol* Contestant Agreement if Clark continued to speak to media outlets regarding his relationship with Abdul.

140.    Also on April 27, 2005, the mainstream news media, such as MTV News, began reporting on the Abdul-Clark affair. Through a spokesperson, Abdul released a written statement through *Access Hollywood* in which Abdul's PR representative stated:

> "Paula Abdul will not dignify the false statements made by Corey Clark with a response," the statement said. "Mr. Clark is an admitted liar and opportunist who engages in unlawful activities. He is communicating lies about Paula Abdul in order to generate interest in a book deal."

141.    On May 4, 2005, trying to combat the reports, FOX representatives blasted Clark for not

going to producers with his concerns before taking to the air with them, according to a statement received by "Primetime":

> "Despite documented procedures and multiple opportunities for contestants to raise any concerns they may have, the producers of 'American Idol' ... were never notified or contacted by Mr. Clark, nor presented any evidence concerning his claims. We will, of course, look into any evidence of improper conduct that we receive. In the meantime, we recommend that the public carefully examine Mr. Clark's motives, given his apparent desire to exploit his prior involvement with 'American Idol' for profit and publicity."

142. In the days following the first public news reports about the love affair, Clarks' record label and management privately arranged for Clark to conduct an interview with ABC News wherein Clark would disclose the factual details of his relationship with Abdul on a May 5, 2005 ABC News broadcast special. ABC named the one-hour special "Fallen Idol".

143. Despite false allegations made by FOX that Plaintiff Clark was attempting to profit from news of his relationship with Abdul, Clark never received a single penny in exchange for his interview on the ABC News "Fallen Idol" special. Clark's record label had invested substantial sums of money into producing and recording his debut album and his management insisted that Clark participate in the interview.

144. While the overwhelming physical evidence presented in the "Fallen Idol" special was provided in good faith by Clark, he had no say or authority whatsoever in the manner in which the May 5, 2005 ABC news special was presented, cut, displayed or edited.

145. Plaintiff had no control over any of the voiceovers or narrative provided by the ABC News Correspondents, including John Quinones.

146. Prior to the show's airing, FOX and/or Abdul's lawyer Martin Singer, threatened to sue ABC News if it aired too much detail about the relationship.

147. While everything Corey Clark personally stated on the ABC News special *in his own words* was as truthful then as it is now, the ABC News special did not disclose the entire story

behind the relationship between Abdul and Plaintiff.

148.    ABC News intentionally omitted key factual details and witness interviews to avoid the threat of litigation from FOX or Abdul. These critical omissions had the effect of portraying an ambiguous picture of the overall relationship between Clark and Abdul.

149.    Notably, the interview footage of Clark's fellow Top 10 Season Two Contestant Trenyce, who was a witness to the relationship between Clark and Abdul, was withheld from the ABC News special.

150.    On May 6, 2005, FOX issued another press release denigrating Plaintiff Clark:

> We have concerns about the motives behind last night's purported news special…as much of it was filled with rumor, speculation and assertions from a disqualified contestant who admitted during the special to telling lies. Regardless, we are absolutely committed to the fairness of this competition. We take any accusations of this nature very seriously, no matter their source, and we have already begun looking into them."

151.    To date, despite a cryptic press release issued by her representatives, Paula Abdul has never *personally* made a public statement or utterance in which she expressly denied her mentoring, friendship and/or romantic relationship with Corey Clark during his participation in Season Two of *American Idol.*

152.    During the summer of 2005, Plaintiff Clark faced a strong "media backlash" led by FOX and *American Idol* producers to discredit his truthfulness and intentionally undermine the sales of his debut album.

153.    Plaintiff's credibility based on his past (false) arrest record – rather than the factual evidence presented of his relationship with Abdul – was called into question by FOX and IDOL producers.

**Marc McClish Statement Analysis**

154.    Mark McClish was a federal law enforcement officer for 26 years. He started his law enforcement career in 1983 with the U.S. Secret Service Uniformed Division. During the two years

he was with the Secret Service he was assigned to the White House. His main duties were protecting the White House complex. He would also on occasion provide protection for President Reagan when the President traveled.

155. Mr. McClish retired from the Marshals Service in 2009 and started Advanced Interviewing Concepts. His company provides interviewing skills training and assists investigators in analyzing statements. He is the author of the books *I Know You Are Lying and Don't Be Deceived.*

156. When the news of the Abdul-Clark affair surfaced in the spring of 2005, McClish published the following statement analysis on his website at statementanalysis.com:

> So, who do we believe? Corey Clark or Paula Abdul? We know what Clark is saying.
>
> Let's see what Paula Abdul has to say about these allegations.
>
> A spokesperson for Abdul issued this statement:
>
> "Paula Abdul will not dignify the false statements made by Corey Clark with a response. Mr. Clark is an admitted liar and opportunist who engages in unlawful activities. He is communicating lies about Paula Abdul in order to generate interest in a book deal."
>
> First, recognize that Paula Abdul did not give this statement. This statement is from her spokesperson. It does not say "I will not dignify..." Instead it says "Paula Abdul will not dignify..."
>
> Secondly, there are no denials in this statement. The spokesperson never says "Paula did not coach Corey Clark." "Paula did not have sexual relations with Corey Clark." The spokesperson only states that Clark is a liar who engages in unlawful activities. All of this could be true and what Clark is saying could also be true.

**FOX's Sham Investigation by its "Independent Counsel" [June-August 2005]**

157. On or about July, 2005, FOX publically stated that it had retained an "Independent Counsel" to conduct a "private investigation" of Corey Clark's "accusations" regarding his "affair" with Paula Abdul.

158. The common, ordinary meaning of "Independent Counsel", whether used in a strictly legal context or used in the laymen's understanding of that term, is an independent prosecutor hired by the federal government to investigate misconduct by governmental officials (e.g., Watergate). Indeed, the term "Independent Counsel" is the title of the federal statute 28 U.S.C. Chapter 40 which

governs the authority and duties of the government's independent counsel.

159.    FOX never retained an "independent counsel", as that term is commonly understood by the public and used by Congress in 28 U.S.C. Chapter 40.

160.    For purposes of the 2005 "private investigation" concerning Plaintiff's relationship with Abdul, FOX retained *private* law firms Gibson Dunn & Crutcher and Morrison & Foerster.

161.    Upon information and belief, Gibson Dunn was already on retainer to perform legal services for FOX and/or News Corporation and had previously performed a wide range of legal services on behalf of FOX.

162.    Upon information and belief, Morrison & Foerster was already on retainer to perform legal services for FREMANTLE and had previously performed a wide range of legal services on behalf of FREMANTLE.

163.    Upon information and belief, as legal advocates retained by FOX for the express purpose of protecting FOX's corporate interests, both law firms of Gibson Dunn and/or Morrison & Foerster had an economic or other vested interest to conduct an investigation that would best serve the business interests of its highly valued corporate client.

164.    Any representation that the law firms Gibson Dunn and/or Morrison & Foerster were retained as "independent counsel" by FOX is plainly misleading and conveys a false impression that the law firms had no vested or economic interest in the result of the investigation.

165.    In July, 2005, when Peter Ligouri, then Chairman of FOX, was asked by the press whether Abdul would be fired if it was determined by the investigation that she engaged in a sexual relationship with Plaintiff, Ligouri responded: "Look, the audience loves Paula. She continues to light up our online site, our message boards. Her specific style seems to be working quite well."

166.    Similarly, when NEWS CORP. CEO Rupert Murdoch was asked about the relationship

**COMPLAINT**

between Abdul and Plaintiff in May 2005, he responded: "What scandal?"

167.    On August 12, 2005, FOX released a statement to the Press claiming that based on the investigation conducted by FOX's private counsel, Gibson Dunn and Morrison & Foerster, FOX determined to "clear" Abdul of all wrongdoing and allow her to maintain her position as an *American Idol* judge moving forward.

168.    None of the law firms' work product, nor any evidence gathered during the course of the purported investigation was disclosed to the public.

169.    For the private law firms' part, they did not issue any public or written statement to the press concerning the quality, methodology or reliability of their purported "independent investigation."

170.    FOX's conclusions and statements to the press concerning the investigation conducted by Gibson Dunn and Morrison & Foerster were purportedly based on FOX's review of the law firms' investigative results.

171.    As a part of the sham investigation, Abdul denied that there was any relationship with Clark except for telephone conversations.

172.    FOX also claimed that Clark's "allegations that he and Ms. Abdul had a sexual relationship have not been substantiated by any corroborating evidence or witnesses, including those provided by Mr. Clark and Ms. Abdul expressly denies that any such relationship ever existed."

173.    Upon information and belief, such purported investigative results have never been reviewed by a disinterested attorney at law.

**Marc McClish's Update Statement Analysis**

174.    After FOX issued its sham investigation report on August 12, 2005, Mr. McClish updated his statement analysis on the subject, which was originally posted on May 5, 2005. Mr. McClish

Case 3:13-cv-00058  Document 1  Filed 01/25/13  Page 30 of 44 PageID #: 130

states as follows:

On August 12, 2005, FOX, which airs *American Idol*, announced that Paula Abdul was cleared of any wrongdoing. FOX had conducted an investigation into Corey Clark's claims. According to FOX the investigation found that Clark's claims "have not been substantiated by any corroborating evidence of witnesses."

FOX also said there was "insufficient evidence that the communications between Mr. Clark and Ms. Abdul in any way aided his performance. Further, we are confident that none of these communications had any impact on the outcome of the competition."

Let's analyze FOX's statements Clark's claims **"have not been substantiated by any corroborating evidence of witnesses."** FOX could not corroborate Clark's allegations.

That does not mean he is making up these claims. FOX also said there was "insufficient evidence that the communications between Mr. Clark and Ms. Abdul in any way aided his performance."

Notice they did not say there was no evidence. They also admit there were communications between Clark and Abdul.

"Further, we are confident that none of these communications had any impact on the outcome of the competition."

They may be confident but this type of language falls short of saying "none of these communications had any impact."

The bottom line is they could not substantiate all of Clark's claims which is what I expected they would say. Perhaps more importantly lets look at what Paula Abdul had to say about FOX's investigation.

"I'm grateful this ordeal is over, and I'm so looking forward to getting back to the job I love. Once again, I thank my fans from throughout the world for their undying love and support."

Once again this is the perfect time for Abdul to issue a denial. She could have said that FOX's findings back her claim that she did not do anything wrong. However, like in her earlier statements issued by here camp she chooses not deny Clark's claims.

Notice that Paula Abdul is not "glad" this ordeal is over. That is what most people would probably say. Instead, she is "grateful." What does the word grateful mean? It means feeling or expressing gratitude, thankful, appreciative. The word "gratitude" means "a feeling of thankful appreciation for favors received."

Does Abdul know that FOX and *American Idol* let her off the hook?

### David Westin's Affirmation of the Existence of a Relationship b/w Clark and Abdul

175.     From March 6, 1997 through December 3, 2010, David Westin served as the president of ABC News and was responsible for all aspects of ABC News' television broadcasts, including *World News with Diane Sawyer*, *Nightline*, *Good Morning America*, *20/20*, *Primetime*, *This Week with Christiane Amanpour*, and *World News Now* and *ABC News Radio*.

31                                  **COMPLAINT**

176.    Mr. Westin also served as a law clerk to J. Edward Lumbard of the United States Court of

Appeals for the Second Circuit, and later clerked Lewis F. Powell of the Supreme Court of the

United States.

177.    On January 24, 2006, Mr. Westin countered FOX's finding that Clarks' claims were

"unsubstantiated".  Mr. Westin publicly stated that the report was well-sourced and had been vetted

carefully.

> "Absolutely, I know the sourcing on the story," said Westin. "We vetted that very, very carefully. reviewed
> it very carefully. We stand by our story. Saying it is unsubstantiated from their point of view, because they
> don't necessarily know who our sources are, is not the same as saying it's wrong, is it? . . . We're right." He
> acknowledged the Fox investigators asked for ABC's sources. Westin declined. "One thing that's sacred for
> us is protecting our confidential sources," added Westin. "This would be disclosing to people who have a
> vested interest, for goodness sakes."

## Plaintiff is Cast Into Exile [September 2005-May 2006]

178.    Following the widespread press release of FOX's sham investigative report, Plaintiff

suffered tremendous reputational damage amongst not only the public, but even amongst close

friends and family members.

179.    Plaintiff's record label stopped returning his calls and promotions for his debut CD

altogether halted.  The group of dancers and background singers he had worked with in preparation

for live performances abandoned him.  His personal manager left him.  In short, Corey Clark quickly

realized that he had been shunned.

180.    FOX's August 2005 publication of the "Independent Counsel" report was deemed the

"final word" on the subject and Corey Clark's *American Idol* nightmare was only going to get worse.

He was now labeled as "the guy who fabricated the story about sleeping with a famous Judge just to

sell a record."

181.    In the Fall of 2005, Plaintiff started receiving death threats from complete strangers in the

streets.  Random people spit on him and damned him to hell.

182.    By December 2005, Corey Clark was served with an eviction notice to vacate his Los

32

Angeles apartment. He didn't have any money. His record label was gone; many of his career associates had abandoned him. All of his hard work in attempting to claw back from his 2003 unceremonious removal from *American Idol* appeared to have been obliterated.

### Plaintiff's Efforts to File a Defamation Lawsuit [Fall 2005-spring 2006]

183. In late 2005, about four months after the news of the "sex scandal" had subsided, Viacom International, Inc. began telecasting a program on VH1 television entitled "VH1 All Access: Embarrassing Moments 2" which contained a segment in which Corey Clark was severely ridiculed and portrayed as a "hoax" and a fame-starved derelict who had completely fabricated his relationship with Abdul.

184. The VH1 Program published the following false and defamatory statement concerning Plaintiff: "and then to find out [the relationship with Abdul was] like all a hoax, all a lie, so embarrassing because it reveals just how completely vain and power and fame hungry you are, to be like oh I will just flat out lie and accuse and deceive people just to get fifteen minutes on TV."

185. The VH1 program that defamed Defendant aired repeatedly through at least April 2006.

186. In May 2006, Plaintiff managed to secure legal counsel to represent him. A California based attorney named Anthony J. Parascandola threatened to file a $20 million lawsuit suit on behalf of Plaintiff for slander, libel and false light invasion of privacy against VIACOM, *inter alia,* in connection with false statements of purported fact made about Plaintiff during the VH1 broadcast.

187. Despite Plaintiff's desire to proceed with the litigation against VIACOM and the NY POST, he was forced under economic duress to stand down because his counsel needed a $30,000-$50,000 up-front payment to file the lawsuit, which Plaintiff did not have. In fact, Plaintiff began living on food stamps during this time period..

### Plaintiff's Suicide Attempt [July 24, 2006]

COMPLAINT

188. By June 2006, Corey Clark reached absolute rock bottom. Before appearing on *American Idol*, he had been a popular, talented, good-looking kid filled with hopes, dreams and ambitions. He had worked almost a decade in the music business focused on one day reaching the top of his career. He had a great sense of humor and made people laugh. Beautiful woman were magnetized by his easy Southern charm and "exotic" looks. His family and friends loved and admired him, his peers respected him. Simon Cowell, for what it was worth, thought the world of him, as did Paula Abdul.

189. For Clark to have made it to the Top 6 (at least) on *American Idol* out of 70,000 hopefuls that year was no small task. He had a strong probability of winning the contest, or at the very least coming in Top 2 or Top 3. His entire life would have been different had he been allowed to exit the show with his integrity intact, rather than as a "lying sister-beater". He was neither of these things. He had legitimate star quality and had been consistently recognized as such by top names in the music industry. But now he had nothing.

190. Ultimately, Corey Clark chose to die. On July 24, 2006, Plaintiff constructed a rope from bed sheets and attempted to take his own life through hanging . . . whether through luck or divine intervention he was able to survive.

### Non-Applicability of State Anti-SLAAP Statutes

191. Plaintiff's claims are not part of a strategic lawsuit against public participation.

192. Plaintiff's claims are a *good faith* effort to seek Truth and Justice, the absence of which shall permanently castigate Plaintiff to a Life of Exile and impair the valuable economic interest in Plaintiff's right of publicity.

193. Defendants' publication of false and defamatory statements concerning Plaintiff were <u>not</u> made in furtherance of a right of free speech.

COMPLAINT

194.     Defendants' publication of false and defamatory statements concerning Plaintiff were <u>not</u> made in furtherance of a right to petition to the government.

195.     Defendants' publication of false and defamatory statements concerning Plaintiff were <u>not</u> made in connection with a public or government issue.

196.     Defendants' publication of false and defamatory statements concerning Plaintiff were <u>not</u> made to any government agency regarding a matter of concern of that government agency.

197.     Any applicable Anti-SLAPP state statutes, including those adopted by the States of Tennessee and New York, do not apply to Plaintiff's causes of action because state Anti-SLAPP statutes are inapplicable to defamation actions premised on diversity jurisdiction in federal courts.

198.     Any applicable Anti-SLAPP state statutes, including those adopted by the States of Tennessee and New York, do not apply to Plaintiff's causes of action because Defendants' publication of the false and defamatory statements were made with knowledge of their falsity, reckless disregard of falsity or negligence of falsity.

**COMPLAINT**

# CAUSES OF ACTION

## COUNT I
### Libel
### *[Against All Defendants]*

199.     Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 198 of this Amended Complaint and each and every part thereof with the same force and effect as though set out at length herein.

#### FALSE AND DEFAMATORY STATEMENTS CONCERNING PLAINTIFF

200.     Defendants have published false and defamatory statements of fact about and concerning Plaintiff Corey Clark.

201.     The false and defamatory statements of fact concerning Corey Clark were published via television by the Defendants.

202.     Plaintiff can prove through the applicable rules of evidence governing this proceeding that the defamatory statements of fact published by the Defendants are <u>false</u>.

203.     Plaintiff identifies the E! TRUE HOLLYWOOD STORY: PAULA ABDUL, AS published on or about January 27, 2012, as containing statements concerning Plaintiff that are capable of defamatory meaning. The Program denies that Abdul had a relationship with Corey Clark during his time on *American Idol.*

204.     The ordinary meaning reasonably conveyed by the published false assertions of fact identified in the Amended Complaint are reasonably understood in a defamatory sense by the recipients of such publication.

205.     Defendants' false and defamatory statements consist of words and language that in their ordinary meaning, considered as a whole in context, have a tendency to harm Plaintiff's reputation or character in the community.

206.     Defendants' false and defamatory statements tend to expose the Plaintiff to public contempt, hatred, ridicule, aversion and disgrace; or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of his friendly intercourse in society.

207.     Defendants have published false and defamatory statements that have a tendency to prejudice the Plaintiff in the eyes of a substantial and respectable minority of the community.

208.     Defendants have published false and defamatory statements concerning Plaintiff that have a tendency to deter third persons from associating or dealing with him, either socially or in his profession.

209.     Defendants have published false and defamatory statements concerning Plaintiff that have a tendency to injure Plaintiff in his occupation, business, trade or profession.

**COMMUNICATIONS TO THIRD PARTIES**

210.     Defendants' publication of false and defamatory statements concerning Plaintiff have been communicated to third parties.

**DEFENDANTS' CONTINUING COURSE OF TORTIOUS CONDUCT**

211.     The false and defamatory statements of fact concerning Plaintiff which continue to be published and re-published by the Defendants are part and parcel of a singular campaign and unified transaction perpetrated by identical wrongful actors against the same victim relating to identical subject matter.     Defendants engaged in this continuing course of wrongful conduct without provocation and without legal or equitable justification.

**RE-PUBLICATION OF RELATED DEFAMATORY MATERIAL BY SAME WRITER**

212.     The defamatory material concerning Plaintiff has been re-transmitted on E! Channel and continues to be disseminated by the Corporate Defendants with the goal of reaching a new audience.

**ABSENCE OF FAIR COMMENT AND CRITICISM PRIVILEGE**

**COMPLAINT**

213.   Defendants' publication of the false and defamatory statements of facts concerning Plaintiff are not shielded by the conditional privilege (and/or common law defense) of Fair Comment and Criticism.

214.   Having omitted the true nature of the relationship between Plaintiff and Abdul, Defendants' statement unfairly imputes Plaintiff as a liar.

### FAULT / INTENT OF DEFENDANTS

215.   Defendants' false and defamatory statements concerning Plaintiff were published to third parties with actual malice.

216.   Defendants' false and defamatory statements concerning Plaintiff were published to third parties with knowledge of their falsity.

217.   Defendants' false and defamatory statements concerning Plaintiff were published to third parties with reckless disregard for the truth or falsity of the statements.

218.   Defendants' false and defamatory statements concerning Plaintiff were published to third parties with Defendants' failure to ascertain the truth of the defamatory statements of fact concerning Plaintiff.

219.   Defendants' publication of the false and defamatory statements omitted key facts surrounding the charges and disposition of a criminal proceeding instituted by the State and blatantly mischaracterized the nature and disposition of such proceeding.

220.   Defendants knew or should have known that the defamatory statements concerning Plaintiff were false and had a tendency to lead to the defamation of Plaintiff's reputation and character.

221.   Plaintiff can establish by clear and convincing evidence that Defendants published false and defamatory statements of fact concerning Plaintiff with serious doubts as to the veracity of the

Case 3:13-cv-00058   Document 1   Filed 01/25/13   Page 38 of 44 PageID #: 138

assertions.

222. Plaintiff can establish by clear and convincing evidence that Defendants published false and defamatory statements of fact concerning Plaintiff with a high degree of awareness that such statements could be proven false.

### CAUSATION AND DAMAGES

223. Plaintiff has suffered – and will continue to suffer – injuries to his reputation and his character as a direct, natural and proximate result of the false and defamatory statements published by Defendants.

224. As a direct, natural and proximate result of Defendants' false and defamatory statements, Plaintiff has suffered from *continuing* exposure to hatred, contempt, ridicule, aversion and disgrace in the community.

225. Plaintiff has suffered "special harm" as a direct, natural and proximate result of Defendants' continuing course of making false and defamatory statements *per se* concerning Plaintiff.

226. The special harm to Plaintiff's reputation and character is particularly severe in this case where the defamatory statements are being disseminated worldwide by Defendants on a daily basis through a E! Channel.

227. As a direct, natural and proximate result of Defendants' false and defamatory statements Plaintiff has sustained "special harm'" in the form of economic damages to his business, trade, occupation and/or profession as a professional musician, singer, songwriter and performer because Defendants false and defamatory statements have inhibited Plaintiff's ability to procure paid work in his profession that is commensurate with his recognized talent and abilities.

228. As a direct, natural and proximate result of Defendants' false and defamatory statements,

Plaintiff has sustained pecuniary loss relating to his business, trade, occupation and/or profession because of the amount of time, work and money he has had to expend in defending his reputation and character, explaining the true facts underlying the claims set forth herein, monitoring Defendants on-going wrongful conduct, and interacting with the Defendants' representatives in his futile attempts to procure a retraction.

229.    As a direct, natural and proximate result of Defendants' false and defamatory statements *per se*, Plaintiff has suffered monetary damages and loss of income due to the decline of his business, loss of good will and injury to business reputation.

230.    Plaintiff has in good faith demanded from the Defendants a retraction of the false and defamatory statements.  Despite his efforts, Defendants have failed to comply with Plaintiff's demand

**COUNT II**
**False Light Invasion of Privacy**
*[Against All Defendants]*

231.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 230 of this Complaint and each and every part thereof with the same force and effect as though set out at length herein.

232.    As an individual citizen of the State of Tennessee, Plaintiff is vested with inalienable rights, including the right to be left alone, the right to liberty and the right to privacy.

233.    Defendants have published statements that convey misleading information or create an erroneous factual inference that makes the Plaintiff out before the public to be something he is not and thereby casts the Plaintiff in a highly offensive false light to the reasonable person.

234.    Specifically, the E! Channel Program conveys the message that Clark did not have any meaningful relationship with Abdul and that Clark was dishonest when he disclosed the nature of the

40                              COMPLAINT

relationship on ABC News.

235.    Defendants knew or should have known that their defamatory statements concerning Plaintiff were false.

236.    Defendants acted with reckless disregard to the falsity of the publicized statements.

**Count III**
**Conspiracy to commit Commercial Product Disparagement / Trade Libel**
**[Against all Defendants Excluding E! Entertainment INC.]**

237.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 236 of this Verified complaint and each and every part thereof with the same force and effect as though set out at length herein.

238.    Defendants published false statements of fact to third parties that are harmful to the business and property interests of the plaintiff.

239.    The independent investigation conducted by the Law Firms of Gibson Dunn & Crutcher, Morrison Foerster, and FOX Inc. portrays Corey Clark and his intellectual property as a singer / songwriter in the least favorable, most injurious light possible.

240.    Defendant Gibson Dunn & Crutcher, Morrison Foerster, and FOX Inc. campaign to disparage plaintiff's reputation in the community at large, is also evidenced by the mass publication of the false results of their independent investigation.

241.    FOX inc. published: Investigators spent three and a half months reviewing materials provided by Clark and Abdul and interviewing 43 people, (10 of whom were eyewitnesses to the conduct between Clark and Abdul alleged by Clark) in an effort to further disparage Clark's name and reputation and conceal the facts and true nature of Clark's disqualification and romantic relationship with Abdul.

41                    COMPLAINT

242.    Defendants' statements about plaintiff's reputation and allegations were made to influence the public to shun Clark further to insure that he would not have a viable career in the music industry.

243.    Defendants' statements were made to cast doubt on the quality of the plaintiff's reputation, goods, and services.

244.    Defendants acted with actual malice through the publication of the false statements concerning plaintiff with intent to harm the interests of the plaintiff.

245.    It was reasonably foreseeable to defendants that the false and defamatory statements concerning plaintiff's reputation and factual allegations would lead to the harm of the plaintiff's property interests or business.

246.    Defendants knew that the statements concerning plaintiff were false.

247.    Defendants acted in reckless disregard of the disparaging statements truth or falsity.

248.    As a direct and proximate result of defendants disparaging remarks about the quality of the plaintiff's reputation, goods and services, plaintiff has sustained special damages from the actual loss of CD sales, digital downloads of his musical works, loss of business opportunity in procuring employment commensurate with his talent as a professional singer and songwriter and loss of goodwill and social mobility in the music industry and his personal life as well.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that this Court to enter a final judgment in favor of Plaintiff and against Defendants that awards Plaintiff the following remedies:

- **permanent injunction** that enjoins Defendants from publishing any false and defamatory statements about Plaintiff relating to his conduct in his trade or profession, and from publishing any disparaging statements about Plaintiff relating to his conduct in his trade or profession including but not limited to the deletion from the Defendants' websites of any reference to Corey Clark's name or likeness without his express authorized consent;

- **compensatory damages** to remedy Plaintiff for harm to his reputation, character and integrity in the community; loss of opportunity to win contest prize; diminution of business profits relating to the sale of Plaintiff's goods and services; loss of opportunity to capitalize on intellectual property rights and constitutional rights;

- **general damages** to remedy Plaintiff for his mental anguish, suffering, humiliation, stress, anxiety, embarrassment, loss of well-being, loss of enjoyment of life and impairment of social mobility;

- **special damages** of two-hundred fifty thousand [**$250,000.00**] to remedy Plaintiff for his actual out-of-pocket pecuniary losses; costs of enforcing his legal rights as against Defendants;

- **aggravated damages** for Defendants' deliberate misconduct, bad faith and ill-will vis-à-vis Plaintiff;

- **exemplary damages** of any *fair* and *reasonable* amount to be determined at a trial by jury, to deter American media organizations similarly situated to Defendants from publishing false and defamatory material about U.S. citizens.

- **punitive damages** to punish Defendants for abusing their constitutional right of free press, abandoning the core functions of journalistic objectivity and reliability,

masquerading biased reports as news content, failing to treat with respect and civility the inherent value of a citizen's name, abusing the constitutional privilege of fair comment and criticism; and substantially deviating from the journalistic canons of ethics adopted by the *American Society of Newspaper Editors and the Society of Professional Journalists*.

- **costs, fees and disbursements** of this action;

- **reasonable attorneys fees** of this action; and

- **further and different relief as the Court deems just and proper**.

**TRIAL BY JURY IS HEREBY DEMANDED**

Dated: January 25, 2013

Nashville, Tennessee

Eugenia Grayer, Esq.

*Attorneys for Plaintiff Corey D. Clark*

44                                                                    **COMPLAINT**