UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| COREY D. CLARK | ) |
|---|---|
| Plaintiff, | ) |
| v. | ) No. 3:13-00058 |
| | ) Judge Sharp |
| E! ENTERTAINMENT TELEVISION, LLC, and FOX BROADCASTING COMPANY, | ) |
| Defendants. | ) |

## MEMORANDUM

Plaintiff Corey Clark, a former contestant on *American Idol* brings this action for libel and false light invasion of privacy[1] against Defendants E! Entertainment LLC and Fox Broadcasting Company based upon E!'s January 27, 2012 airing of a program titled "E! True Hollywood Story: Paula Abdul" (the "Program"). Both Defendants have filed Motions to Dismiss (Docket Nos. 41 & 43) to which Plaintiff has responded in opposition (Docket Nos. 59-62) and Defendants have replied (Docket Nos. 65 & 66). On May 9, 2013, the Court heard oral argument. For the following reasons, the Court finds Plaintiff's claims time-barred and, accordingly, Defendant's Motions will be granted and this case will be dismissed.

### I. FACTUAL BACKGROUND

According to the Amended Complaint, which the Court accepts as true for present purposes,

---

[1] The First Amended Complaint also contains a claim for false advertising in violation 5 U.S.C. § 1125(a)(1)(B) which is directed solely at E! and which Plaintiff concedes should be dismissed. (Docket No. 59 at 2).

1

and based upon this Court's review of the Program,[2] the relevant facts can summarized as follows.

Plaintiff was a top ten finalist in the second season of Fox's *American Idol* talent show when TheSmokingGun.com website reported that he had previously been arrested in Topeka, Kansas. As a result of that report, Plaintiff was disqualified from further competition on March 31, 2003, purportedly because he had failed to disclose or reveal information about the arrest, which had occurred on October 12, 2002. On the day of the disqualification, Fox issued a statement to TheSmokingGun.com which stated that Plaintiff had been removed from the show and continued:

> All participants are required to provide full and accurate information to assist in background checks, including disclosure of any prior arrests. Corey withheld information about a prior arrest which, had it been known, might have affected his participation in the show. Due to his failure to disclose, compounded by an error in a police report which misspelled Corey's name, the incident was not discovered during the background check. The producers and network feel that Corey's behavior warrants his disqualification. . . .

(Docket No. 17, Amended Complaint ¶ 182).

Sometime after his ouster from the contest, Plaintiff publicly proclaimed that Ms. Abdul had been his mentor on the show, that the two had become romantically involved, and that he had an affair with Ms. Abdul while still a contestant on *American Idol*. Ms. Abdul has publicly denied the charges.

In response Plaintiff's claimed relationship with Ms. Abdul, Fox issued a series of statements in 2005. In a May 4, 2005 statement to *Primetime*, Fox stated:

> Despite documented procedures and multiple opportunities for contestants to raise any concerns they may have, the producers of 'American Idol'. . . were never notified or contacted by Mr. Clark, nor presented any evidence concerning his

---

[2] In conjunction with its Motion to Dismiss, E! filed a Request for Judicial Notice of the Program and a transcript of the same. (Docket No. 46). No objections have been lodged to that request and this Court has watched the Program. In undertaking that review, the Court "is not bound by the characterizations placed upon the program by the parties." Battle v. A&E Television Networks, LLC, 837 F, Supp, 2d 767, 772 (M.D. Tenn. 2011).

2

claims. We will, of course, look into any evidence of improper conduct that we receive. In the meantime, we recommend that the public carefully examine Mr. Clark's motives, given his apparent desire to exploit his prior involvement with 'American Idol' for profit and publicity.

(Id. ¶ 207). The day after the *Primetime* special, Fox issued a press release that stated:

We have concerns about the motives behind last night's purported news special . . . as much of it was filled with rumor, speculation and assertions from a disqualified contestant who admitted during the special to telling lies. Regardless, we are absolutely committed to the fairness of this competition. We take any accusations of this nature very seriously, no matter their source, and we have already begun looking into them.

(Id. ¶ 216).

Fox issued additional statements over the next several months. These included a (1) a May 16, 2005, statement to People Magazine that "Corey Clark was removed from the show for failing to disclose his criminal arrest history"; (2) a July 28, 2005 statement that Fox had retained "independent counsel" to conduct a private investigation into Plaintiff's allegations that he had an affair with Ms. Abdul; and (3) an August 12, 2005 statement that Plaintiff's claim about a sexual relationship had not been substantiated by any corroborating evidence or witnesses (including those provided by Plaintiff), that Ms. Abdul expressly denied the allegations, and that an investigation undertaken by the Gibson, Dunn and Morrison & Foerster law firms had cleared Ms. Abdul of wrongdoing, thereby allowing her to continue as a judge on *American Idol*. (Id. ¶¶ 221, 229, 240 & 244).

Many of the claims surrounding Plaintiff's disqualification from *American Idol*, the imbroglio surrounding his claim of an alleged affair with Ms. Abdul, and Fox's handling of the matter were contained in the Program, which first aired as early as August 2005. The original program was updated and rebroadcast on January 27, 2012, and that republication serves as the basis

3

for Plaintiff's present claims.

The Program focuses on Ms. Abdul's career, including her role as a judge on *American Idol*. It also describes Plaintiff's participation on that show, his ascension to becoming a finalist, and his disqualification after the TheSmokingGun.com report. Included is a clip from an *American Idol* producer who explains that Plaintiff was cut from the show because he did not disclose on a background questionnaire that he had been arrested. The Program then states Plaintiff was in fact arrested, was later cleared of the charges, and because he was cleared of the charges Plaintiff did not disclose the arrest on the questionnaire.

The Program also recounts Plaintiff's later claims that he had an had an affair with Ms. Abdul. A voiceover states that Ms. Abdul initially made no public statement, but later claimed Plaintiff's allegations were lies. The Program goes on to describe media and fan reactions to the story, and reports that an investigation by independent counsel hired by Fox found that Plaintiff's claims regarding the alleged affair were not substantiated. This topic concludes with a clip of USA Today's Elysa Gardner stating, "At the end of the day maybe only the two of them know what really happened." Towards the end of the Program, the narrator states, "The former 'Laker girl' who taught Janet Jackson how to be 'nasty' – and shot 'straight up' the pop charts herself – proved time and again that she's tough enough to stay on top."

## II. **LEGAL DISCUSSION**

Based upon the re-airing of Program on January 25, 2012, and its incorporation of the 2005 statements attributed to Fox, Plaintiff filed suit in this Court on January 25, 2013. Count I of the Amended Complaint alleges defamation while Count II alleges false light invasion of privacy. Defendants move to dismiss both counts arguing that Plaintiff's claims are barred by the statute of

4

limitations. They also argue that Plaintiff's claims fail on the merits because the Program recounts precisely those facts that Plaintiff admits in the First Amended Complaint regarding the dispute between himself and Ms. Abdul, including what each side claimed occurred, and how events unfolded in the media.

"A claim for common law defamation may be based upon written (libel) or spoken (slander) words." Battle, 837 F. Supp. 2d at 770 (citing Quality Auto Parts Co., Inc. v. Bluff City Buick Co., 876 S.W.2d 818, 820 (Tenn. 1994)). A claim for false light invasion of privacy often overlaps with a defamation claim, but "the differences between the two torts warrant their separate recognition." West v. Media Gen'l Convergence, Inc., 53 S.W.3d 640, 645 (Tenn. 2001). Nevertheless, "[i]n recognition of the kinship between defamation and false light, the Tennessee Supreme Court [in West] defined the contours of the tort of false light with reference to the Tennessee law on defamation." Seaton v. TripAdvisor, LLC, 2012 WL 3637394, at *3 (E.D. Tenn. Aug. 22, 2012).

"Tennessee courts have long recognized libel as the 'greater wrong,' and that recognition is evident in Tennessee's differing statutes of limitations for slander and libel." Watson v. Fogolin, 2010 WL 1293797, at *4 (Tenn. Ct. App. April 1, 2010). Under Tenn. Code Ann. § 28-3-103, an action for slander must "be commenced within six (6) months after the words are uttered," while an action for libel must "be commenced within one (1) year after the cause of action accrued," Tenn. Code Ann. § 28-3-104.

As for a false light invasion of privacy claim, the Tennessee Supreme Court in West, after recognizing that cause of action, also held that the same statute of limitations as a corresponding defamation claim controls. The court wrote:

> Finally, we recognize that application of different statutes of limitation for false light and defamation cases could undermine the effectiveness of limitations on defamation

5

claims. Therefore, we hold that false light claims are subject to the statutes of limitation that apply to libel and slander, as stated in Tenn. Code Ann. §§ 28-3-103 and 28-3-104(a)(1), depending on the form of the publicity, whether in spoken or fixed form.

West, 53 S.W.3d at 648.

Here, of course, the Program was aired in a television broadcast, suggesting that the shorter period for slander (spoken words) could apply. However, the Tennessee Court of Appeals in Eisenstein v. WTVF-TV, News Channel 5 Network, LLC, 389 S.W.3d 313, 317 (Tenn. Ct. App. 2012), held that, while "[o]rdinarily, a libel action involves a written defamation," television broadcasts "'should be considered as libel; particularly if they are based on written scripts.'" In doing so, the court relied upon its previous decision in Ali v. Moore, 984 S.W.2d 224 (Tenn. Ct. App. 1998), which observed that "[n]o reported case in Tennessee has directly addressed whether a television broadcast should be designated as libel or slander," that "[t]here is no clear consensus among our sister states concerning this issue," and that characterizing defamatory statements in broadcast as libel was the "most prevalent" view. Ali, 984 S.W.2d at 227. "The theory behind the rule is that a broadcast's wide dissemination puts 'the broadcaster upon the same footing as the publisher of a newspaper.'" Eisenstein, 389 S.W.3d at 317 n.4 (quoting Restatement (Second) of Torts § 568A cmt. a (1977)). Accordingly, the Court applies a one year limitation to Plaintiff's defamation and false light invasion of privacy claims.

The original Complaint was filed in this Court on January 25, 2013, which is within one year of the airing of the Program on January 27, 2012. Nevertheless, Plaintiff's claims are time-barred because they are based upon alleged defamatory statements which were first and widely published in 2005.

Plaintiff repeatedly references the 2012 Program in his Amended Complaint as a

6

"republication" of the earlier program. He claims, however, that the 2012 rebroadcast contained additions not found in the original airing. For example, the 2012 Program identifies certain dates that post-date the original show and which are said to be important dates in Ms. Abdul's career, including the end of her relationship with *American Idol* in 2009, the start of her new dance show *Live to Dance* in 2011, and her reuniting with Simon Cowell, a fellow judge on *American Idol* on a new show in September 2011 called *The X Factor*. However, neither in his Amended Complaint nor in response to Defendants' Motions to Dismiss does Plaintiff point to anything new or changes in the story regarding his Kansas arrest, his ouster from *American Idol*, or his alleged affair with Ms. Abdul.

In Milligan v. United States, 670 F.3d 686, 698 (6th Cir. 2012), the Sixth Circuit stated that "Tennessee follows the single publication rule, meaning that a plaintiff's cause of action accrues only once, at the time of publication, and later publications do not give rise to additional defamation causes of action," and cited for that proposition Applewhite v. Memphis State Univ., 495 S.W.2d 190, 193–97 (Tenn. 1973). In Applewhite, the Tennessee Supreme Court canvassed the law on the single versus multiple publication rules and ultimately found that

> [t]he single publication rule is suited to the contemporary publishing world where large numbers of copies of a book, newspaper, or magazine are circulated. It would substantially impair the administration of justice to allow separate actions on each individual copy and it would create the possibility of harassment, and multiple recoveries against defendants. Therefore, we hold under Tennessee law a plaintiff should be limited to a single cause of action based on the circulation of copies of an edition of a book, newspaper, or periodical.

Id. at 194.

The Sixth Circuit's pronouncement in Milligan regarding the single publication rule could not be any clearer, yet Plaintiff effectively asks the Court to ignore it. He argues that "[t]he

7

substantive law of Tennessee, not the 6th Circuit decision in the Milligan case is controlling in the present matter" because "'[w]hen a federal court's jurisdiction is invoked under diversity of citizenship pursuant to 28 U.S.C. § 1332, the court must apply the substantive law of the state in which it is situated." (Docket No. 60 at 6, quoting Katahn v. Hearst Corp., 742 F. Supp. 437, 439 (M.D. Tenn. 1990)). Plaintiff also argues that Applewhite, on which Milligan relied, "had nothing to do with republication, only redistribution," and that "[t]he issue of whether an original defamer is liable for the mass republication of defamatory material by a third party . . . has never been addressed in Tennessee." (Docket No. 62 at 12 & 16).

The problem is, the Sixth Circuit was applying Tennessee law in a case on appeal from Judge Trauger's decision ruling in favor of Sinclair Broadcasting on plaintiff's state law libel claim relating to a television broadcast by Fox 17. Milligan is controlling authority. Just as a "'panel cannot' reconsider a prior published case that interpreted state law, 'absent an indication by the [state] courts that they would have decided [the prior case] differently,' Blaine Constr. Corp. v. Ins. Co. of N. Am., 171 F.3d 343, 350 (6th Cir. 1999)," lower courts are not free to ignore controlling circuit authority:

> "Where no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do. In performing this ventriloquial function, however, the federal court is bound by ordinary principles of stare decisis. Thus, when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue.

Rutherford v. Columbia Gas, 575 F.3d 616, 619 (6th Cir. 2009) (emphasis added) (quoting Wankier v. Crown Equip. Corp., 353 F.3d 862, 866 (10th Cir. 2003)); see also Evanston Ins. Co. v. BioPort Corp. 2008 WL 1732963, at *2 (W.D. Mich. Apr. 10, 2008) (decision by the Sixth Circuit deciding

8

a question of Michigan law is binding authority on district courts in the Sixth Circuit unless the Michigan courts have subsequently indicated" they would have decided the matter differently); cf., Frye v. Blue Ridge Neuroscience Center, P.C., 70 S.W.3d 710, 716 (Tenn. 2002) ("While the decisions of the Sixth Circuit are not binding on this Court, they are insightful on the resolution of issues of Tennessee law in our courts.").

Plaintiff relies on Swafford v. Memphis Individual Practice Ass'n, 1998 WL 281935 (Tenn. Ct. App. June 8, 1998), for the proposition that "in the context of a television broadcast of allegedly defamatory material, the substantive law of Tennessee is that the single publication rule in Tennessee applies only to any one edition of a television broadcast." ((Docket No. 60 at 7). Specifically, Plaintiff relies upon the following language from that case:

> The single publication rule is an exception to the traditional view that each of several communications to a third person by the same defamer is a separate publication. Under this exception, "[a]ny one edition of a book or newspaper, or any one radio or television broadcast, exhibition of a motion picture or similar aggregate communication is a single publication." Restatement (Second) of Torts § 577A(3) (1977).

Swafford, 1998 WL 281935, at *4.

Swafford is an unpublished Tennessee Court of Appeals decision which pre-dates Milligan and therefore cannot be said to be "an intervening decision of the state's highest court [that] has resolved the issue." Rutherford, 575 F.3d at 619. Moreover, Swafford is readily distinguishable.

Swafford involved allegedly false information given to the National Practitioner Data Bank regarding the "quality of care of physicians," including plaintiff, and "[e]ach transmission by the Data Bank of the report on [plaintiff] was released in response to an affirmative request by a hospital or other health care entity." Id. at *5. Acknowledging that "[t]he single publication rule was recognized in Tennessee in Applewhite," the Swafford court found it inapplicable because "[u]nlike

9

the mass publication of a book, magazine or television commercial, it is unlikely that more than a handful of individuals or entities would gain access to the information stored in the data base." Id. at * 4 & 8. Rather, the situation at hand was more akin to the dissemination of a credit report where each republication of an incorrect report caused a distinct and separate harm as opposed to an "aggregate publication" that is widely disseminated. Id. At 8.

In Clark v. Viacom Intern., Inc., 2013 WL 1245681 (M.D. Tenn. Mar. 26, 2013), Judge Haynes rejected this same Plaintiff's argument that Swafford "expressly rejected the 'single publication rule' as it applies to defamatory internet-based publications." Id. at *3. Judge Haynes did so because the controlling "issue in Swafford was '[w]hether the single publication rule should be applied to the dissemination of alleged defamatory information in the Data Bank to health care providers,'" and the Swafford court "expressly disclaimed such a broad interpretation of its holding." Id. at *3-4 (quoting Swafford, 1998 WL 281934, at *5). The undersigned is likewise unpersuaded the Swafford should be read as standing for the general proposition that the single publication rule should not apply to publicly disseminated broadcasts or rebroadcasts of the exact same material.

### III. CONCLUSION

Plaintiff's claims are based upon allegedly defamatory statements that were published in 2005 and republished in 2012 without any additions or changes to the allegedly defamatory content. As such, his complaint comes some six years too late and Defendants' Motions to Dismiss will be granted.

10

An appropriate Order will be entered.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE