UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

COREY D. CLARK                          )
                                        )
    Plaintiff,                          )
                                        )
    v.                                  )        No. 3:13-00058
                                        )        Judge Sharp
E! ENTERTAINMENT TELEVISION,            )
LLC, and FOX BROADCASTING               )
COMPANY,                                )
                                        )
    Defendants.                         )

## MEMORANDUM

After a final judgment was entered in accordance with this Court's Order and Memorandum dismissing the Amended Complaint because Plaintiff's claims were time-barred, Plaintiff Corey Clark filed a "Motion to Vacate the District Court's Order and Judgment in its Entirety Pursuant to Rules 59 and 60." (Docket No. 93). Defendants E! Entertainment Television LLC ("E!") and Fox Broadcasting Company have filed responses in opposition, to which Plaintiff has replied. (Docket Nos. 95, 95 & 99).

For the reasons that follow, the Court will grant Plaintiff's Motion to Vacate and vacate the judgment that granted Defendants' Motions to Dismiss, and dismissed this action on statute of limitations grounds. However, the Court will grant Fox's Motion to Dismiss for failure to state a claim. The Court will also grant in part, and deny in part, E!'s Motion to Dismiss.

## I. MOTION TO VACATE

In its Memorandum dismissing this case on statute of limitations grounds, the Court ruled:

> In Milligan v. United States, 670 F.3d 686, 698 (6th Cir. 2012), the Sixth
> Circuit stated that "Tennessee follows the single publication rule, meaning that a

1

plaintiff's cause of action accrues only once, at the time of publication, and later publications do not give rise to additional defamation causes of action," and cited for that proposition Applewhite v. Memphis State Univ., 495 S.W.2d 190, 193–97 (Tenn.1973). . . .

       \*       \*       \*

The Sixth Circuit's pronouncement in Milligan regarding the single publication rule could not be any clearer, yet Plaintiff effectively asks the Court to ignore it. He argues that "[t]he substantive law of Tennessee, not the 6th Circuit decision in the Milligan case is controlling in the present matter" because " '[w]hen a federal court's jurisdiction is invoked under diversity of citizenship pursuant to 28 U.S.C. § 1332, the court must apply the substantive law of the state in which it is situated." (Docket No. 60 at 6, quoting Katahn v. Hearst Corp., 742 F. Supp. 437, 439 (M.D. Tenn.1990)) . . . .

The problem is, the Sixth Circuit was applying Tennessee law in a case on appeal from Judge Trauger's decision ruling in favor of Sinclair Broadcasting on plaintiff's state law libel claim relating to a television broadcast by Fox 17. Milligan is controlling authority. Just as a " 'panel cannot' reconsider a prior published case that interpreted state law, 'absent an indication by the [state] courts that they would have decided [the prior case] differently,' Blaine Constr. Corp. v. Ins. Co. of N. Am., 171 F.3d 343, 350 (6th Cir.1999)," lower courts are not free to ignore controlling circuit authority:

> "Where no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do. In performing this ventriloquial function, however, the federal court is bound by ordinary principles of stare decisis. Thus, when a panel of this Court has rendered a decision interpreting state law, *that interpretation is binding on district courts in this circuit*, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue.

Rutherford v. Columbia Gas, 575 F.3d 616, 619 (6th Cir. 2009) (emphasis added).

Clark v. EA Ent. Television, LLC, 2014 WL 2615795, at \*4-5 (M.D. Tenn. June 12, 2014).

Plaintiff claims the "Court committed a clear error of law when it (1) "misconstrued the single publication rule as being exclusive of republication"; (2) "misapplied" Milligan; and (3) "failed to address in its ruling whether republication applies when a television show is rebroadcast with an intention to reach a new audience." (Docket No. 93 at 1-2). All three arguments are

2

premised on the notion that the Court did not consider that the republication rule can co-exist with the single publication rule.

"A motion to alter or amend judgment under Rule 59(e) may be granted if there is '(1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice.'" Interra Corp. v. Henderson, 428 F.3d 605, 620 (6th Cir.2005) (quoting GenCorp, Inc. v. Am. Int'l Underwriters, 178 F.3d 804, 834 (6th Cir. 1999)).[1] "Rule 59(e) allows for reconsideration; it does not permit parties to effectively 're-argue a case.'" Howard v. United States, 533 F.3d 472, 475 (6th Cir. 2008) (quoting Sault Ste. Marie Tribe v. Engler, 146 F.3d 367, 374 (6th Cir. 1998)). "[T]he purpose of Rule 59(e) is to allow the district court to correct its own errors, sparing the parties and appellate courts the burden of unnecessary appellate proceedings." Howard v. United States, 533 F.3d 472, 475 (6th Cir.2008)

Upon reconsideration, the Court reiterates that Milligan could not be any clearer. But it is clear only for the proposition that Tennessee follows the single publication rule. Milligan did not address republication, and jurisdictions that follow the single publication rule consistently appear to recognize an exception for republication. See Graboff v. Am. Ass'n of Orthopaedic Surgeons, 559 F. App'x 191, 195 n.4 (3rd Cir. 2014) (Pennsylvania follows the single publication rule, but "[r]epublication of defamatory material, for example in a new edition of a book or in an edited and reissued form . . . resets the statute of limitations"); Yeager v. Bowlin, 693 F.3d 1076, 1081 (9th Cir. 2012) (applying California law and stating that "[u]nder the single-publication rule, the statute of limitations is reset when a statement is republished"); Nationwide Bi-Weekly Admin, Inc. v. Belo

---

[1] Although Plaintiff's Motion is brought under both Rules 59(e) and 60, the Court analyzes it under Rule 59(e) "because it presents a substative legal challenge to [this] court's reasoning," whereas "the province of Rule 60" is "clerical error or palpable defect[.]" Kalamazoo Acquisitions, LLC v. Westfield Ins. Co., Inc., 395 F.3d 338, 342 n.7 (6th Cir. 2005).

3

Corp., 512 F.3d 137, 146 (5th Cir. 2007) (applying Texas law and stating that "the single publication rule provides that when an allegedly defamatory statement is published in a new format, such as when a hardcover book is republished in paperback form, it is considered 'republished' and the statute of limitations begins to run from the date of republication"); Jankovic v. Int'l Crisis Grp., 494 F.3d 1080, 1088 (D.C. Cir. 2007) ("Like most common-law jurisdictions, the District of Columbia has adopted the modern 'single publication' rule . . . but republication in a new edition creates a new publication on the rationale that the intent is to reach a new audience"); Etheridge-Brown v. Am. Media, Inc., 2014 WL 1416352, at *2 (S.D.N.Y. Mar. 31, 2014) ("Courts have held that, notwithstanding the single publication rule, the publication of a work may constitute a 'republication'—giving rise to a new cause of action and re-starting the statute of limitations"); Salyer v. So. Poverty Law Ctr., 701 F. Supp.2d 912, 914 (W.D. Ky. 2009) (predicting that Kentucky would follow single publication rule and that republication is a narrow exception to that rule); Atkinson v. McLauglin, 462 F. Supp.2d 1038, 1052 (D.N.D. 2006) ("even under the single publication rule, the courts have recognized that [material] may be republished and create a new cause of action for defamation"); Nichols v. Moore, 334 F. Supp.2d 944, 952 (E.D. Mich. 2004) (citation omitted) ("The single publication rule does not apply, however, 'where an item is published initially, but is then republished, not merely as a belated release of the original publication, but as a republication'"). In stating that Tennessee followed the single publication rule, Mulligan relied on Applewhite wherein the Tennessee Supreme Court canvassed the law on the single versus multiple publication rules and ultimately concluded:

> The single publication rule is suited to the contemporary publishing world where large numbers of copies of a book, newspaper, or magazine are circulated. It would substantially impair the administration of justice to allow separate actions on each individual

> copy and it would create the possibility of harassment, and multiple recoveries against defendants. Therefore, we hold under Tennessee law a plaintiff should be limited to a single cause of action based on the circulation of copies of an edition of a book, newspaper, or periodical.

Applewhite, 495 S.W.2d at 194. Applewhite was not concerned with the issue of republication. Rather, and as the above suggests, the concern was with circulation of *copies of an edition* of a publication.

In arriving at its conclusion, the Tennessee Supreme Court discussed two prior appellate court decisions applying Tennessee's statute of limitations in defamation cases where republication occurred: Underwood v. Smith, 27 S.W.1008 (1894), which dealt with an article published in the Knoxville Evening Sentinel and then republished the next morning in the Knoxville Daily Tribune, and Riley v. Dunn & Bradstreet, 172 F.2d 303 (6th Cir. 1949), which dealt with the timeliness of a defamation claims that was based on the republication of a report. It found Underwood "inapplicable" because "[t]hat case did not consider the question of whether *separate copies of the same issue* would create separate causes of action[.]" Applewhite, 495 S.W.2d at 192 (emphasis added). It distinguished Riley because in Applewhite "no *second edition or other reprinting* has been shown and the Riley case does not consider whether recent distribution *without a republication* could support an action." Id. (emphasis added).

Plaintiff concedes that "[n]o Tennessee appellate court has ever addressed the issue of whether to extend the common law single publication rule to include the exception of republication." (Docket No. 94 at 7). "In the absence of a clear pronouncement from the [Tennessee] Supreme Court, a federal court sitting in diversity 'must predict how the court would rule by looking to all the available data.'" Stryker Corp. v. XL Ins. Am., 735 F.3d 349, 361 (6th Cir. 2012) (quoting

Allstate Ins. Co. v. Thrifty Rent–A–Car Sys., Inc., 249 F.3d 450, 454 (6th Cir. 2001)).  Given that long before adoption of the single publication rule Tennessee courts recognized the republication doctrine, given that the republication doctrine is a widely accepted (but narrowly construed) exception to the single publication rule, and given that the Tennessee Supreme Court in Applewhite did not abrogate its prior decision in Underwood or call into question the Sixth Circuit's reasoning in Riley, the Court believes that the republication doctrine continues to be applicable in Tennessee.[2]

The program which serves as the basis for Plaintiff's claims was aired on January 27, 2012, and this lawsuit was filed within a year thereafter on January 25, 2013.  Under the republication exception to the single publication rule, Plaintiff's complaint was timely.[3]

Upon reconsideration, the Court will grant Plaintiff's Motion to Vacate.  This does not end the inquiry, however, because in their Motions Dismiss, Defendants also argued dismissal was appropriate under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim.

## II. **MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM**

### A. **Background**

In its prior Memorandum, the Court summarized the allegations in the Amended Complaint.

---

[2] The Court rejects Defendants' assertion that recognizing the republication doctrine in a single publication rule state runs the risk of allowing the exception to swallow the rule.  In an oft-quoted passage, the New York Court of Appeals has observed:
> Republication, retriggering the period of limitations, occurs upon a separate aggregate publication from the original, on a different occasion, which is not merely "a delayed circulation of the original edition." The justification for this exception to the single publication rule is that the subsequent publication is intended to and actually reaches a new audience.

Firth v. State of New York, 98 N.Y.2d 365, 371 (N.Y. 2002).

[3] The Court notes that the statements attributable to Fox were made some six years before the original Complaint was filed.  However, under the republication doctrine, "an original defamer is liable for republications that are the 'natural and probable result' of the defamer's actions," Meyers v. Levinson, 185 F. App'x 224, 225 (4th Cir. 2006) (citation omitted), or are "reasonably foreseeable," Tunca v. Painter, 965 N.W.2d 1237, 1262 (Ill. App. 2012) (collecting cases).

6

The Court reiterates that summary here so as to place the parties' arguments in context:

Plaintiff was a top ten finalist in the second season of Fox's *American Idol* talent show when TheSmokingGun.com website reported that he had previously been arrested in Topeka, Kansas. As a result of that report, Plaintiff was disqualified from further competition on March 31, 2003, purportedly because he had failed to disclose or reveal information about the arrest, which had occurred on October 12, 2002. On the day of the disqualification, Fox issued a statement to TheSmokingGun.com which stated that Plaintiff had been removed from the show and continued:

> All participants are required to provide full and accurate information to assist in background checks, including disclosure of any prior arrests. Corey withheld information about a prior arrest which, had it been known, might have affected his participation in the show. Due to his failure to disclose, compounded by an error in a police report which misspelled Corey's name, the incident was not discovered during the background check. The producers and network feel that Corey's behavior warrants his disqualification. . . .

(Docket No. 17, Amended Complaint ¶ 182).

Sometime after his ouster from the contest, Plaintiff publicly proclaimed that Ms. Abdul had been his mentor on the show, that the two had become romantically involved, and that he had an affair with Ms. Abdul while still a contestant on *American Idol*. Ms. Abdul has publicly denied the charges.

In response to Plaintiff's claimed relationship with Ms. Abdul, Fox issued a series of statements in 2005. In a May 4, 2005 statement to *Primetime*, Fox stated:

> Despite documented procedures and multiple opportunities for contestants to raise any concerns they may have, the producers of 'American Idol'. . . were never notified or contacted by Mr. Clark, nor presented any evidence concerning his claims. We will, of course, look into any evidence of improper conduct that we receive. In the meantime, we recommend that the public carefully examine Mr. Clark's motives, given his apparent desire to exploit his prior involvement with 'American Idol' for profit and publicity.

7

(Id. ¶ 207). The day after the *Primetime* special, Fox issued a press release that stated:

> We have concerns about the motives behind last night's purported news special . . . as much of it was filled with rumor, speculation and assertions from a disqualified contestant who admitted during the special to telling lies. Regardless, we are absolutely committed to the fairness of this competition. We take any accusations of this nature very seriously, no matter their source, and we have already begun looking into them.

(Id. ¶ 216).

Fox issued additional statements over the next several months. These included (1) a May 16, 2005, statement to People Magazine that "Corey Clark was removed from the show for failing to disclose his criminal arrest history"; (2) a July 28, 2005 statement that Fox had retained "independent counsel" to conduct a private investigation into Plaintiff's allegations that he had an affair with Ms. Abdul; and (3) an August 12, 2005 statement that Plaintiff's claim about a sexual relationship had not been substantiated by any corroborating evidence or witnesses (including those provided by Plaintiff), that Ms. Abdul expressly denied the allegations, and that an investigation undertaken by the Gibson, Dunn and Morrison & Foerster law firms had cleared Ms. Abdul of wrongdoing, thereby allowing her to continue as a judge on *American Idol*. (Id. ¶¶ 221, 229, 240 & 244).

Many of the claims surrounding Plaintiff's disqualification from *American Idol*, the imbroglio surrounding his claim of an alleged affair with Ms. Abdul, and Fox's handling of the matter were contained in the Program, which first aired as early as August 2005. The original program was updated and rebroadcast on January 27, 2012, and that republication serves as the basis for Plaintiff's present claims.

The Program focuses on Ms. Abdul's career, including her role as a judge on *American Idol*. It also describes Plaintiff's participation on that show, his ascension to becoming a finalist, and his

disqualification after the TheSmokingGun.com report. Included is a clip from an *American Idol* producer who explains that Plaintiff was cut from the show because he did not disclose on a background questionnaire that he had been arrested. The Program then states Plaintiff was in fact arrested, was later cleared of the charges, and because he was cleared of the charges Plaintiff did not disclose the arrest on the questionnaire.

The Program also recounts Plaintiff's later claims that he had an had an affair with Ms. Abdul. A voiceover states that Ms. Abdul initially made no public statement, but later claimed Plaintiff's allegations were lies. The Program goes on to describe media and fan reactions to the story, and reports that an investigation by independent counsel hired by Fox found that Plaintiff's claims regarding the alleged affair were not substantiated. This topic concludes with a clip of USA Today's Elysa Gardner stating, "At the end of the day maybe only the two of them know what really happened." Towards the end of the Program, the narrator states, "[t]he former 'Laker girl' who taught Janet Jackson how to be 'nasty' – and shot 'straight up' the pop charts herself – proved time and again that she's tough enough to stay on top."

Based upon the foregoing, Plaintiff filed a 346-paragraph, 68-page Amended Complaint. He sues both E! and Fox under Tennessee common law for defamation (Count I) and false light invasion of privacy (Count II).[4]

## B. **Standard of Review**

As a general rule, in considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must take "all well-pleaded material allegations of the pleadings" as true. Fritz v.

---

[4] Plaintiff also sued Defendant E! for violation of the Lanham Act (Count III), but has agreed to dismissal of that claim. (Docket No. 59 at 2).

9

Charter Township of Comstock, 592 F.3d 718, 722 (6th Cir. 2010). The factual allegations in the complaint "need to be sufficient to give notice to the defendant as to what claims are alleged, and the plaintiff must plead 'sufficient factual matter' to render the legal claim plausible, i.e., more than merely possible." Id. (quoting Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949-50 (2009)). "'A legal conclusion couched as a factual allegation,'" however, "need not be accepted as true on a motion to dismiss, nor are recitations of the elements of a cause of action sufficient." Id. (quoting Hensley Mfg. v. ProPride, Inc., 579 F.3d 603, 609 (6th Cir. 2009) and Bell Atl. Corp. v. Twombly, 127 S.Ct. 1955, 1965 (2007)).

Further, in determining whether a complaint sets forth a plausible claim, a court may consider not only the allegations, but "may also consider other materials that are integral to the complaint, are public records, or are otherwise appropriate for the taking of judicial notice." Ley v. Visteon Corp., 543 F.3d 801, 805 (6th Cir. 2008) (citation omitted). The parties agree that, in considering the Motions to Dismiss, the Court can view the Program which has been placed into the record, and is not bound by characterizations placed on the Program by the parties. See Battle v. A & E Television Networks, LLC, 837 F. Supp.2d 767, 772 (M.D. Tenn. 2011).

## C. Analysis

"'To establish a prima facie case of defamation in Tennessee, the plaintiff must establish that: 1) a party published a statement; 2) with knowledge that the statement is false and defaming to the other; or 3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement.'" Seaton v. TripAdvisor, LLC, 728 F.3d 592, 596-97 (6th Cir. 2013) (quoting Sullivan v. Baptist Mem'l Hosp., 995 S.W.2d 569, 571 (Tenn. 1999). To establish a claim for the false light invasion of privacy, a plaintiff must prove "that a defendant published a

10

matter concerning the plaintiff, placing the plaintiff before the public in a false light which is highly offensive to a reasonable person, and the defendant had knowledge that his statement was false or acted recklessly with regard to the falsity of the publicized statement." Gard v. Harris, 2010 WL 844810, at *3 (Tenn. Ct. App. Mar. 11, 2010).

A claim for defamation often overlaps with a claim for false light invasion of privacy, but the Tennessee Supreme Court has determined that "the differences between the two torts warrant their separate recognition." West v. Media Gen'l Convergence, Inc., 53 S.W.3d 640, 645 (Tenn. 2001). Even so, "actual malice is the appropriate standard for false light claims when the plaintiff is a public official or public figure, or when the claim is asserted by a private individual about a matter of public concern," id. just as it is for a defamation claim brought by a public figure, Curtis Publ'g Co. v. Butts, 388 U.S. 130 (1967).[5] Further, [c]ourts may determine as a matter of law whether a statement is defamatory or place another in a false light because in each instance the standard is that of the 'reasonable person.'" Harris v. Gaylord Ent. Co., 2013 WL 6762372, at *6 n.3 (Tenn. Ct. App. Dec. 19, 2013).

### 1. Defamation

"The basis for an action for defamation, whether it be slander or libel, is that the defamation has resulted in an injury to the person's character and reputation." Quality Auto Parts Co., Inc. v. Bluff City Buick Co., 876 S.W.2d 818, 820 (Tenn. 1994). In Tennessee, the issue of whether a statement is *capable* of a defamatory meaning is a question of law to be decided by the court. Memphis Publ'g Co. v. Nichols, 569 S.W.2d 412, 419 (Tenn. 1978) (citations omitted). If the court

---

[5] For purposes of the pending Motions for Summary Judgment, "Plaintiff acknowledges that he was a public figure at the time of *American Ido*, Season Two, and that he continues to entertain as an entertainer." (Docket No. 62 at 6).

determines that the statement or communication is not defamatory, then dismissal of the action is appropriate; otherwise, it is for the jury to determine whether the statement was understood by its intended audience to be defamatory. See, id.; Forsman v. Rouse, 2008 WL 2437644 at * 3 (M.D. Tenn. 2008).

In determining whether a statement is capable of a defamatory meaning, the "[a]llegedly defamatory statements should be judged within the context in which they are made," and given their usual meaning, "as a person of ordinary intelligence would understand them in light of the surrounding circumstances." Revis v. McClean, 31 S.W.3d 250, 253 (Tenn. Ct. App. 2000). Typically, "'[i]t is a relatively simple, straightforward task for a plaintiff to identify with absolute precision the exact words that are alleged to be defamatory.'" West v. Media Gen. Operations, Inc., 120 F. App'x 601, 615 (6th Cir. 2005) (quoting, West v. Media Gen. Operations, Inc., 250 F. Supp.2d at 923, 932 (E.D. Tenn. 2001)).

"'However, in cases involving television broadcasts with a stream of audio and visual components interacting with each other, the plaintiff's burden of identifying allegedly defamatory words with absolute precision and exactitude is much more complicated and poses an especially difficult problem.'" Id. In an analysis agreed with by the Sixth Circuit, the district court in West explained the difficulties inherent in establishing defamation in cases involving television programs, writing:

> . . . [T]elevision programs are divided into a number of video and audio segments. In some segments, the audio and video are of the same event such as when a person makes a remark or statement on camera. In other segments, the audio may be a "voice-over" to a different video or photograph. "It is the juxtaposition of these varying segments into an audio and video mosaic that conveys the meaning or meanings intended." . . . In reviewing a television broadcast for possible defamatory statements, a court and jury cannot confine their analysis to the words alone. The court and jury are necessarily required to also consider the impact of the video

12

> portion of the program since the television medium offers the publisher the opportunity, through visual presentation, to emphasize and convey ideas in ways that cannot be ascertained from a mere reading of the words in a written transcript.
>
> \* \* \*
>
> . . . Although it is important, as in any defamation case, to focus on the words and language published by the defendant, this should not be the only focal point to the exclusion of other relevant facts and details. The words must be viewed in their proper context in juxtaposition to all of the audio and visual components of the television broadcasts as a whole. The defendant's defamatory words, standing alone, cannot readily be identified in isolation without also considering the accompanying visual images, the tone of voice of the announcer or reporter, along with the combined audio and video editing effects. If words are taken completely out of the context of the audio and visual components of the television broadcasts as a whole, then it would not constitute a satisfactorily accurate, effective method for identifying televised statements and visual images which are alleged to have a combined defamatory meaning.

Id. at 615 (quoting, West, 250 F. Supp.2d at 932-34) (internal citation omitted).

In response to both Defendants' Motions to Dismiss, Plaintiff argues that the Program is capable of a defamatory meaning because

> the assertion by Abdul that Plaintiff is a liar . . . combined with E!'s statement that Abdul's "proved time and again that she's tough enough to stay on top" anyway . . . implies that she overcame Plaintiff's lies to recover her career and stay on top. Certainly these statements are capable of defamatory meaning in the eyes and ears of the audience.

(Docket No. 60 at 13; Docket No. 62 at 6)

Simply quoting Plaintiff's argument shows just how attenuated his defamation claim is against Defendant Fox. Plaintiff's claim is based upon what Abdul is alleged to have said and *E!'s statement* about her ability to persevere. Even under the republication doctrine which allow for an original defamer to be held liable for reasonably foreseeable re-broadcasts, Plaintiff does not adequately explain how an original defamer can be liable for a rebroadcast which alters the original

13

statement and it is that altered statement that is said to be defamatory.[6]

Regardless, and just as it did in conjunction with its earlier decision, the Court has viewed the Program. Based on that review, the Court concludes that the Program is not capable of a defamatory meaning and, therefore, both Defendants are entitled to judgment on Plaintiff's defamation claim.

As noted previously, in determining whether a statement is defamatory, context matters. Viewed in context, the Program reports both Plaintiff's claim of an affair and Ms. Abdul's denials, but takes no affirmative position in the dispute. It did not adopt Ms. Abdul's statements or claim that they were accurate – E! simply reported them. In fact, the Program explicitly states, "only the two of them know what really happened."

As for the statement that Ms. Adbul was "tough enough to stay on top," even out of context it is incapable of a defamatory meaning and, when considered in context, is clearly not defamatory. The statement was towards the very end of the 1 ½ hour Program that describe many of the ups and down in Ms. Abdul's career. It comes just after a recounting of her short-lived show "Live to Dance" and her re-joining Simon Cowell on the X-Factor in 2011 and states:

> The former Laker girl who taugh Janet Jackson how to be "nasty," and shot straight up the pop charts herself, proved time and again that she's tough enought to stay on top. Paula Abdul just keeps on doing what she loves the most – inspiring young talent all over the world.

"Stay on top" was not said in the context of Clark's allegations and, in fact, the segment discussing the alleged affair concludes with the statement by Ms. Gardner of USA Today that "at the end of the day maybe only the two of them know what really happened."

---

[6] Fox's original statement was that "allegations that [Clark] and Ms. Abdul had a sexual relationship have not been substantiated by any corroborating evidence or witnesses, including those provided by Mr. Clark, and Ms. Abdul expressly denies that any such relationship existed." (First Am. Comp. ¶ 244).

14

Plaintiff's reliance on Milkovich v. Lorain Journal Co., 497 U.S. 1 (1990) is misplaced. There, a newspaper columnist wrote a column which was replete with the suggestion that the local high school wrestling coach lied during proceedings relating to the team being placed on probation. The Supreme Court held that simply couching a statement—"Jones is a liar"—in terms of opinion—"In my opinion Jones is a liar"—does not dispel the factual implications contained in the statement.

This case is markedly different from Milkovich. Neither E! nor Fox stated that Plaintiff was a liar, or that it was their opinion that he was a liar. Rather, the Program reports on what Ms. Abdul is alleged to have said in response to Plaintiff's allegation and tracks what occurred once the allegations were made. Unlike the defendant in Milkovich, Ms. Abdul was responding to an allegation (to which any denial would suggest Plaintiff lied), and E! reported the dispute as it was entitled to do. Green v. CBS, Inc., 286 F.3d 281, 284 (5th Cir. 2002) ("In cases involving media defendants, such as this, the defendant need not show the allegations are true, but must only demonstrate that the allegations were made and accurately reported."); Stilts v. Globe Int'l, Inc., 950 F. Supp. 220, 223 ("Although the article is cleverly written in order to heighten interest and sensationalize its contents for the tabloid press, when read for a true appreciation of the subject matter, it is clear that the article simply recounts the existence of an actual controversy between the [two parties], with comments attributed to the respective participants.").

**2. False Light**

As noted, the Tennessee Supreme Court in West recognized false light invasion of privacy as a tort distinct from defamation. Therefore, it is possible that a statement, while not defamatory, can place a plaintiff in a false light. See Eisenstein v. WTVF-TV News Channel 5, 389 S.W.3d 313

15

(Tenn. Ct. App. 2012) (affirming summary judgment as to plaintiff's libel claim, but reversing the grant as to some of plaintiff's false light claims).

With regard to both Defendants, Plaintiff argues that "[t]he false light that Defendant has painted of Plaintiff is that he is a liar who nearly destroyed Paula Abdul's career with his 'lies,' and that he lied in order to get ahead by selling more CDs." (Docket No. 60 at 13; Docket No. 61 at 10). Each "Defendant painted this false light," Plaintiff argues, by:

- Quoting directly from Abdul that she does not "respond to lies, no matter how vicious, no matter how hurtful," regarding Plaintiff's allegations about her;

- Inserting Abdul's opinion that the Prime Time special *Fallen Idol* occurred to her as an infomercial (although the narrator himself bent the truth himself by stating that Abdul said that Plaintiff appeared on the show because he had a national audience to plug his upcoming album when she never said that); and,

- Asserting, via E's narrator, that Abdul's "proved time and again that she's tough enough to stay on top anyway."

(Docket No. 60 at 13-14; Docket No. 61 at 10)(internal citations to Amended Complaint omitted).

Again Plaintiff's claim against Fox is attenuated and the Court concludes that he fails to state a false light invasion of privacy claim as to that Defendant. The entire Program at issue is E!'s take on Ms. Abdul career and its recounting of the alleged relationship between Plaintiff and her. E! may have paraphrased statements made by Fox, but it was E! that produced, narrated, edited, and provided the audio and visual effects for the Program. While an original speaker may be liable for republication that is "reasonably foreseeable" or its "natural and probable consequence," the Program is an E! broadcast (or publication) that Fox is not alleged to have had a hand in creating or producing.

Dismissal of the false light claim as to Fox is therefore warranted. As Fox notes, to hold otherwise would subject a speaker "to perpetual liability for republications by totally unrelated

16

strangers that alter the original statements to convey a potentially defamatory message." (Docket No. 65 at 9).

The Court will not, however, dismiss the false light invasion of privacy claim as to E! at this time. This is so even though E! may have accurately reported that Plaintiff made a claim which Ms. Abdul characterized as a lie.

In West, the Tennessee Supreme Court stated:

> The facts may be true in a false light claim. However, the angle from which the facts are presented, or the omission of certain material facts, results in placing the plaintiff in a false light. "'Literal accuracy of separate statements will not render a communication "true" where the implication of the communication as a whole was false.' ... The question is whether [the defendant] made "discrete presentations of information in a fashion which rendered the publication susceptible to inferences casting [the plaintiff] in a false light.'" Santillo v. Reedel, 430 Pa.Super. 290, 634 A.2d 264, 267 (1993)(citing Larsen v. Philadelphia Newspapers, Inc., 375 Pa. Super. 66, 543 A.2d 1181 (1988)) (emphasis added). Therefore, the literal truth of the publicized facts is not a defense in a false light case.

389 S.W.3d at 645 n.5. In other words, "the falsehood involved in a false light action 'may consist in dissemination of matters which, while technically true, give an objectionably false impression where the communicator fails to modify the basic statement with amplifying facts which modify the statement to create a less objectionable impression corresponding to full reality.'" Eisenstein, 389 S.W.3d at 318.

"Full reality" is not necessarily clear from the Program itself. Obviously, because the Program is a biography of Ms. Abdul, much is heard from her. However, and even though Plaintiff's allegations were an important aspect of the show, nothing is heard from Plaintiff – his picture appears on several occasions, but there is no interview with him or a voiceover from him.

Further, the Program cites to an "independent investigation" which also allegedly revealed

17

that Plaintiff's claims of the affair were unsubstantiated. But Plaintiff asserts (and maybe E! knew) that the supposedly independent investigation was actually conducted by a law firm "already on retainer to perform legal services for Fox." (Docket No. 17 Amended Complaint ¶ 234). The Program also references a poll which allegedly showed 59% of the fans polled believed that Plaintiff was untruthful about the affair, but the basis for that poll and its scientific validity or accuracy is not explored.

When the facts are construed in a light most favorable to Plaintiff, one conclusion that can be drawn from the Program is that E! intentionally chose to present the information in such a way as to infer that Plaintiff made up the affair, and also that he did so in an effort to advance his career at the expense of Ms. Abdul's. This may be a tough sell, but it is not something the Court can determine based on the pleadings. Further, a reasonable person could find such a portrayal or the implications from such a portrayal to be highly offensive. As such, the Court will not dismiss Plaintiff's false light claim as to Defendant E! at this time.

The Court recognizes that to succeed on his remaining claim against E!, Plaintiff will have to show actual malice, and E! seeks dismissal because Plaintiff has not made that showing. E!'s argument is better made in the context of a Motion for Summary Judgment. Lewis v. NewsChannel 5 Network, L.P., 238 S.W.3d 270, 283 (Tenn. Ct. App. 2007) (collecting cases) ("Summary judgments are particularly well-suited for false light and libel claims because the determination concerning whether the plaintiff is a public figure is a question of law, . . . , as is the determination of whether a public figure has come forward with clear and convincing evidence that the defendant was acting with actual malice.").

"The 'actual malice' fault standard is a subjective one in which the ultimate question is

whether the defendant made the statement with 'knowledge that the statement was false' or with 'reckless disregard for the truth.'" Thomas M. Cooley Law School v. Kurzon Strauss, 759 F.3d 522, 531 (6th Cir. 2014) (quoting Harte-Hanks Comm. v. Connaughton, 491 U.S. 657, 664 (1989)). "To make a statement with reckless disregard for the truth, a defendant must have made the statement 'with a high degree of awareness of probable falsity,' or must have 'entertained serious doubts as to the truth of his publication[.]'" Id..

In response to Plaintiff's assertion that a failure to investigate could show actual malice, E! argues:

> The controversy at issue centers on a private act between two public figures—Abdul and Plaintiff—with each providing a conflicting account as to their relationship. E! has no ability, much less obligation, to investigate and determine who is telling the truth in this "he-said-she-said" controversy.

(Docket No. 66 at 10). E! may ultimately prevail on this argument, but it is premature.

"[T]he failure to investigate, alone, will not support a finding of actual malice, but the 'purposeful avoidance of the truth' may do so." Cobb v. Time, Inc., 278 F.3d 629, 637 (6th Cir. 2002) (quoting, Harte–Hanks, 491 U.S. at 692). " In a case where the defendant is reporting a third party's allegations, the standard of reckless disregard may be met where 'there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.'" Id. (quoting, Harte-Hanks at 692).

Whether there were obvious reasons for E! to doubt Ms. Abdul's denial or the accuracy of Plaintiff's claims the Court does not know. While "[t]he question whether there is sufficient evidence in the record to permit a finding of actual malice is a question of law," and while "[t]he unique nature of the interest protected by the actual malice standard requires that reviewing courts conduct an independent review to determine whether that standard has been met,. . . [i]n making this

19

determination, the reviewing court must consider the factual record in full." Id.

### III. CONCLUSION

On the basis of the foregoing, (1) Plaintiff's Motion to Vacate will be granted; (2) Defendant Fox's Motion to Dismiss will be granted; and (3) Defendant E!'s Motion to Dismiss will be granted in part and denied in part.

An appropriate Order will enter.

*/s/ Kevin H. Sharp*
_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE